Dewey **HEALING**, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, et al., Plaintiff,

v.

Paul **JONES**, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, et al., Defendants.

Civ. No. 579 Prescott.

United States District Court
D. Arizona.

May 25, 1959.

HAMLEY, Circuit Judge.

This action was instituted in the United States District Court for the District of Arizona on August 1, 1958, to obtain a determination of the rights and interests of the Navajo Tribe, Hopi Tribe, and individual Indians to the area set aside by Executive Order of December 16, 1882. The instituting of such an action was authorized by Congress by the Act of July 22, 1958, Public Law 85–547, 85th Cong., 1st Sess., 72 Stat. 402. Pursuant to that act, and on December 30, 1958, this district court of three judges was duly constituted to hear and determine the cause.[1]

The original plaintiff was Willard Sekiestewa, chairman of the Hopi Tribal Council of the Hopi Indian Tribe. He has since been succeeded as chairman of such council by Dewey Healing, and the latter has been substituted as party plaintiff. The defendants are Paul Jones, chairman of the Navajo Tribal Council of the Navajo Indian Tribe, and the United States, represented herein by William P. Rogers, Attorney General of the United States.

The answer filed by Paul Jones denies essential allegations of the complaint, sets up a counterclaim against plaintiff, and states a cross claim against the United States. Plaintiff moved to dismiss the counterclaim of Paul Jones, to strike certain portions thereof, and to require Paul Jones to file a more definite statement of his counterclaim.

The answer filed by the Attorney General on behalf of the United States contains two defenses, in the first of which it is asserted that this court is without jurisdiction. Pursuant to Rule 12(d) Federal Rules of Civil Procedure, 28 U.S.

Boyden, Tibbals, Staten & Croft, John S. Boyden, Salt Lake City, Utah, for plaintiff. Fennemore, Craig, Allen & McClennen, Phoenix, Ariz., of counsel.

Norman M. Littell, Charles J. Alexander, Washington, D. C., for defendant Jones, Jos. F. McPherson, C. Lawrence Huerta and Walter F. Wolf, Jr., Window Rock, Ariz., Laurence Davis, Phoenix, Ariz., of counsel.

Jack D. H. Hays, U. S. Atty., Phoenix, Ariz., Floyd L. France, Atty., Dept. of Justice, Washington, D. C., for defendant William P. Rogers, Atty. Gen.

Before HAMLEY, Circuit Judge, and YANKWICH and WALSH, District Judges.

1. The court as originally constituted consisted of Frederick G. Hamley, Circuit Judge, and Dave W. Ling and James A. Walsh, District Judges. It thereafter became necessary for Judge Ling to withdraw from the case because of other court commitments. Accordingly, on April 24, 1959, the Chief Judge of the Ninth Judicial Circuit entered an order revoking the order of December 30, 1958, and reconstituting the court to consist of the undersigned judges. The parties have stipulated that the newly-designated judge, Leon R. Yankwich, may act upon the motions theretofore argued and taken under submission on the basis of the briefs, transcripts, and other papers filed, including the transcript of the oral argument on such motions.

C.A., plaintiff moved for a preliminary hearing and determination of this first defense, which motion was thereafter granted.

The motions of plaintiff addressed to the counterclaim of Paul Jones and the matter of determining the merits of the first defense of the United States came on for hearing before this court at Phoenix, Arizona, on March 16, 1959. In disposition of these matters this court has today entered an order dismissing the first defense of the United States, denying the motion to dismiss the cross complaint, granting in part the motion to strike portions of the counterclaim, reserving for future disposition the remainder of the motion to strike and the motion for a more definite statement of the counterclaim, and giving plaintiff twenty days to serve and file his reply.

The purpose of this opinion is to explain the reasons of the court for the action taken.

### First Defense of the United States

The first defense of the United States in which the jurisdiction of this court is challenged is based on the ground that the rights and interests to be determined herein present a political and not a judicial question. Therefore, it is asserted, the pleadings do not present a judicial case or controversy within the meaning of Article III, § 2, of the Constitution.

■ Jurisdiction to hear and determine this cause was purportedly conferred upon this court by the Act of July 22, 1958, supra. But Congress is without power to assign to the judicial branch any duties other than those which are properly judicial, to be performed in a judicial manner. Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246. Duties are properly judicial and are to be performed in a judicial manner if they are of a kind contemplated by Article III, § 2 of the Constitution. In so far as here relevant, § 2 reads:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority * * to Controversies to which the United States shall be a Party * * *."

■■ This provision of the Constitution does not contemplate that the courts shall or may exercise general supervisory power over the executive or administrative branches of the government. Keim v. United States, 177 U.S. 290, 293, 20 S.Ct. 574, 44 L.Ed. 774; Constitution of the United States of America, Rev. and Anno., 1952, Senate Document No. 170, 82d Cong., 2d Sess., page 546. See, also, The Federal Courts and the Federal System, Hart and Wechsler, 1953, pages 192–197. As Chief Justice Marshall said in Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 170, 2 L.Ed. 60:

"* * * The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion. Questions in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."

In Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299, the principle just stated was given application in a case involving Indian matters. The court there said (187 U.S. at page 565, 23 S.Ct. at page 221):

"Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government. * * *"

In view of the foregoing, if the United States is correct in contending that the rights to be determined herein present a political and not a judicial question, it is also correct in concluding that this

court is without jurisdiction to entertain the cause.

Contending that the claims and rights sought to be dealt with in this action are of a political nature, the Attorney General argues that

"* * * the claims of the contesting parties, the Hopi and the Navajo Indians, are more nearly that they have claims which should be recognized by the political authorities, not that the proper authorities have granted them titles which must be recognized by the courts as a judicial matter. * * *" Memorandum of Attorney General, page 3.

In further support of this view, the Attorney General contends that (1) the Secretary of the Interior never exercised powers conferred upon him in the Executive Order of December 16, 1882, in such a way as to vest any rights in any particular part of the lands described in that order in any particular Indians; and (2) in the Act of July 22, 1958, Congress did not purport to settle the question as to interests in the lands described in that order, and failed to furnish the court with any criteria or standards by which this court could settle the controversy. In connection with the latter contention, the Attorney General argues that the only criterion Congress purported to establish was that the court should recognize such claims "as may be just and fair in law and equity." Memorandum of Attorney General, page 3.

Consideration of this argument calls for analysis of the Act of July 22, 1958, pursuant to which this suit was brought.

In the first sentence of § 1 of this act it is stated that the lands described in the Executive Order dated December 16, 1882, "are hereby declared to be held by the United States in trust for the Hopi Indians and such other Indians, if any, as heretofore have been settled thereon by the Secretary of the Interior pursuant to such Executive order." It is next provided (second sentence of § 1) that specified Indian tribes and persons are authorized to commence or defend an ac-

tion "for the purpose of determining the rights and interests of said parties in and to said lands and quieting title thereto in the tribes or Indians establishing such claims pursuant to such Executive order as may be just and fair in law and equity."

The tribes and persons authorized to appear as plaintiffs in such action are as follows: "The Navaho Indian Tribe and the Hopi Indian Tribe, acting through the chairmen of their respective tribal councils for and on behalf of * * * any Navaho or Hopi Indians claiming an interest in the area set aside by Executive order dated December 16, 1882, and the Attorney General on behalf of the United States * * *." The tribes and persons authorized to be sued as defendants include the tribes and persons named above "and any other tribe of Indians claiming any interest in or to the area described in such Executive order * * *." Section 1, second sentence.

Section 2 of the act makes it clear that the decision of the court is to include a determination as to whether the rights or interests which particular tribes, or individual members thereof, are found to have in all or portions of the described lands are exclusive or joint. Thus, the first sentence of § 2 of the act reads:

"Lands, if any, in which the Navaho Indian Tribe or individual Navaho Indians are determined by the court to have the exclusive interest shall thereafter be a part of the Navaho Indian Reservation. Lands, if any, in which the Hopi Indian Tribe, including any Hopi village or clan thereof, or individual Hopi Indians are determined by the court to have the exclusive interest shall thereafter be a reservation for the Hopi Indian Tribe. * * *"

The remainder of the Act of July 22, 1958, is not relevant to the present inquiry.

It therefore appears that the act purports to authorize the bringing of an action for the purpose of determining the

rights and interests of certain tribes and individual Indians to lands described with particularity in the Executive Order of December 16, 1882, and "quieting title" thereto.

If the "title" referred to is a vested equitable interest, and if the identity of the holders thereof and the extent and nature of the respective rights and interests of each, can be fixed by deciding questions of fact and law, then the judicial power is constitutionally invoked. If, on the other hand, the "title" referred to is less than a vested equitable interest and is dependent for its continuance upon the exercise of political judgment by the legislative and executive branches of the government, or if the identification of the holders of such title and the extent and nature of the respective rights and interests of each cannot be fixed without exercising, or reviewing the exercise of, political judgment, then the judicial power is not constitutionally invoked.

■■ We consider first the nature of the "title" at issue. An unconfirmed executive order creating an Indian reservation conveys no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President. "Such rights," as it was said in Hynes v. Grimes Packing Co., 337 U.S. 86, 103, 69 S.Ct. 968, 979, 93 L.Ed. 1231, "may be terminated by the unilateral action of the United States without legal liability for compensation in any form * * *." An executive order of the kind issued on December 16, 1882, made the Indians therein described no more than tenants at the will of the government. See Confederated Bands of Ute Indians v. United States, 330 U.S. 169, 176, 67 S.Ct. 650, 91 L.Ed. 823; Sioux Tribe of Indians v. United States, 316 U.S. 317, 330–331, 62 S.Ct. 1095, 86 L.Ed. 1501.

It follows from what has just been said that as long as the lands in question had status only as executive order lands, the parties to this suit could have had no interest therein amenable to judicial determination. Their sole recourse would have been to Congress, since Article IV, § 3, of the Constitution confers upon Congress exclusively "the 'power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.'" Sioux Tribe of Indians v. United States, supra, 316 U.S. at page 324, 62 S.Ct. at page 1098.

■ But Indians and Indian tribes may, through treaty or Congressional enactment, gain property rights in lands formerly held as a part of the public domain. The title so conveyed may be the substantial equivalent of fee simple, or it may be considerably less. The quality of the rights secured to Indians by such a treaty or act of Congress depends upon the language or purpose of the instrument or statute. Hynes v. Grimes Packing Co., supra, 337 U.S. at pages 103–104, 69 S.Ct. at page 979.

■ Here Congress undertook by the enactment of the Act of July 22, 1958, to convey to certain Indians equitable interests in the lands theretofore described in the executive order. It did so, as we have seen, by declaring all such lands to be held by the United States in trust for such Indians. Congress could not thereafter, in the exercise of its political judgment, deprive the beneficiaries of this trust of their interest therein without compensating them for such taking. See Sioux Tribe of Indians v. United States, supra, 316 U.S. at page 326, 62 S.Ct. at page 1099.

This means that, from the date of that enactment, the beneficiaries of this trust had a vested equitable interest therein capable of judicial recognition and protection. There is no constitutional reason why this judicial recognition and protection may not take the form of a decree quieting title where Congress, as here, expresses a willingness to have this done.

We therefore conclude that the property interests which are authorized to be dealt with in this suit are of a kind which can be fixed and determined through the exercise of judicial power.

This brings us to the question of whether the identity of the holders of

this vested equitable interest and the extent and nature of the respective rights and interests of each can be fixed by deciding questions of fact and law, or whether it will be necessary to exercise, or review the exercise of, political judgment.

At least some of the beneficiaries of the trust are specifically named in the Act of July 22, 1958, creating the trust. They are " * * * the Hopi Indians * * * " (first sentence of § 1). Defendant Paul Jones contends that the words "the Hopi Indians" as used in this declaration of trust mean "the Hopi Tribe." Defendant Jones' brief on motions, page 4. We are not presently advised whether plaintiff disputes this assertion. At most, however, the determination as to whether the named beneficiaries are individual Hopi Indians or the Hopi Indian Tribe or both presents a question of statutory construction.

The other beneficiaries, if any, of the trust created by the Act of July 22, 1958, are described in the declaration of trust (first sentence of the act) as " * * * such other Indians, if any, as heretofore have been settled thereon by the Secretary of the Interior pursuant to such Executive order." Since the quoted language speaks in retrospect and the executive order was issued on December 16, 1882, we know that the beneficiaries, if any, in addition to the Hopi Indians must be Indians who have been settled on the described lands between December 16, 1882, and July 22, 1958.

But not all Indians other than Hopis who have been settled on these lands during the indicated period, if any, are necessarily beneficiaries under the trust. In order to be beneficiaries it must also be shown that they were settled thereon "by the Secretary of the Interior pursuant to such Executive order." Referring to the executive order (Senate Rep. No. 265, 85th Cong., 1st Sess., May 1, 1957, page 2) we find that it set aside the lands "for the use and occupancy of the Hopi and such other Indians as the Secretary of the Interior may see fit to settle thereon." In order to fix the identity of the other beneficiaries, if any, in addition to the Hopi Indians, it is therefore necessary to determine what other Indians the Secretary of the Interior saw fit to settle on the described lands during the critical period.

The making of such a determination in turn poses a number of questions of fact and law. Without intending to delineate with precision or finality the specific factual and legal issues thus raised (a task which must await pretrial conference), it can be said that they will be of the following general nature:

*Questions of fact:* (1) The identity of the tribes and Indians other than Hopis who used or occupied any of the lands in question between December 16, 1882, and July 22, 1958; (2) the kinds, purposes, and extent of any such use and occupancy, the specific lands so used, and occupied, and whether such use and occupancy was exclusive or joint; (3) the specific action or inaction of the Secretary of the Interior or his authorized representatives during the critical period tending to indicate approval, ratification, acquiescence, or recognition of such use and occupancy, or tending to prove the opposite thereof.

*Questions of law:* (1) Whether such use and occupancy by other Indians, if any, was of such character as to constitute settlement on the lands within the meaning of the act; (2) whether with regard to any Indians other than Hopis settled thereon the action or inaction of the Secretary of the Interior or his authorized representatives during the period in question warrants the conclusion that the Secretary saw fit to settle such Indians on such lands; (3) whether the action taken or withheld by the Secretary of the Interior or his authorized representatives was validly taken or withheld; (4) whether the other Indians who may be beneficiaries of the trust, if any, are limited to those who were settled thereon on July 22, 1958; (5) whether the rights and interests of the other Indians who may be beneficiaries of the trust, if any, are limited to rights and interests actually pos-

sessed and being exercised on July 22, 1958.

Questions of fact and law of the kind listed above have the same characteristics as those with which courts of law deal every day. Some of them involve the admission and evaluation of evidence introduced to establish relevant facts. Others call for an interpretation of statutes and agency orders, rules, and regulations, and perhaps a decision as to their validity. Still others may require a determination as to whether there has been compliance with statutes and a valid exercise of administrative power and authority. No exercise, or review of the exercise, of political judgment is called for. No issue is presented as to what the Secretary of the Interior should have done, or whether his action or inaction is meritorious as a matter of policy.

Much of what has just been said concerning the question of identifying the holders of the vested equitable interest in these lands is equally applicable with regard to the issues involved in determining the extent and nature of the respective rights and interests of these holders, if any. The questions of fact and law which will necessarily be decided are similar, and to some extent identical, to the kind of factual and legal questions which have been listed above.

One criterion set out in the 1958 act which relates both to the identity of the holders of the vested equitable interests and the extent and nature of their respective holdings remains to be discussed.

■ It is provided, in the second sentence of § 1 of that act, that in determining the rights and interests of the parties in and to such lands and quieting title thereto, the court shall be guided by what "may be just and fair in law and equity." It is not surprising that such a criterion is to be found in the act, in view of the fact that the quieting of titles is a well-recognized branch of equity jurisdiction. See United States v. McIntosh, D.C.E.D.Va., 57 F.2d 573, 575.

We need not now make a definitive statement as to just what considerations may be pressed upon the court by virtue of this criterion. It is sufficient to say that they must be considerations of a kind which a court of equity may appropriately evaluate and apply. They may not be of a political or a policy-forming nature.

■ We are therefore of the opinion that both the identity of the holders of the vested equitable interest in these lands and the extent and nature of their respective holdings may be determined through the exercise of judicial power. Earlier in this opinion we expressed a similar view concerning the nature of the property interests which are involved. As noted above, these comprise all the issues and subject matter of this action. The conclusion necessarily follows that this court has jurisdiction to hear and determine this cause and that the first defense of the United States must be dismissed.

### Motion to Dismiss Counterclaim

Plaintiff has moved to dismiss the counterclaim of Paul Jones on the ground that it fails to state a claim against plaintiff upon which relief can be granted. Defendant Paul Jones resists the motion. The United States takes no position as to this or the other motions to be discussed below.

Plaintiff advances two reasons why, in his opinion, the counterclaim is fatally deficient. The first of these is that it does not adequately allege the necessary elements to establish a claim under the act authorizing the suit. In this connection, the plaintiff asserts, "it is incumbent upon defendants to allege and prove that the Indians on whose behalf their claims are asserted were: (a) *settled* upon the lands described in the complaint, (b) by the Secretary of the Interior, (c) pursuant to the Executive Order of December 16, 1882, (d) before the Act of July 22, 1958, (e) and that their claims are just and fair in law and equity."

Defendant Paul Jones has not explicitly accepted this statement of elements necessary to the establishment of the claims he advances in the counterclaim. However, if we correctly interpret the brief filed and oral argument made in his behalf, he is in general agreement with plaintiff that the five factors listed above comprise the ingredients essential to the establishment of the Navajo claims. Accordingly we accept for present purposes this statement of the essential elements which defendant Jones must establish in order to prevail on his counterclaim.

Allegations to the effect that the Navajo Indians settled upon the lands described in the complaint (element (a) above) are to be found in paragraph 2 of the counterclaim. Allegations to the effect that such settlement was by the Secretary of the Interior (element (b) above) are contained in paragraphs 5, 8, 10, and 14 of the counterclaim. Allegations to the effect that this was done pursuant to the Executive Order of December 16, 1882 (element (c) above) are set out in paragraphs 5, 10 and 14 of the counterclaim.

There is no express allegation in the counterclaim to the effect that such settlement was effectuated before the Act of July 22, 1958 (element (d) above). The fact is, however, that the counterclaim was filed on December 1, 1958, which was only a little more than four months after the July 22, 1958, enactment. We therefore construe the words "and continuing until the present day," as used in paragraph 2 of the counterclaim, and the words "to the present day," as used in paragraph 14, as referring to the date of the July 22, 1958, enactment, and as not referring to any acts or events occurring after that date.

■■■ There is no express allegation in the counterclaim to the effect that the Navajo claims are "just and fair in law and equity" (element (e) above). As in the case of such terms as "arbitrary" and "capricious," the terms "just" and "fair" state legal conclusions and their express inclusion in a pleading serves no

useful purpose. See Billings Utility Co. v. Advisory Committee, 8 Cir., 135 F.2d 108, 112. The important inquiry is whether the factual allegations set out in the counterclaim, if assumed to be true, tend to show that such claims are just and fair. We think that they do.

■■■ It is therefore our opinion that the counterclaim adequately alleges the necessary elements to establish the claims asserted.

■■■ As his second reason for asking that the counterclaim be dismissed, plaintiff asserts that it contains averments repugnant to the necessary allegations of such a claim. The allegations said to be subject to this criticism are those to the effect that the Navajo Indians using and occupying the lands in question participated in Navajo tribal affairs and shared in the benefits which accrued to Navajos "in other parts of the Navaho reservation." Such allegations are repugnant to the allegations of Navajo settlement on the executive order lands, plaintiff contends, because if these Navajos received benefits from another Navajo reservation they were not legally entitled to benefits from the executive order lands.

It may or may not be that Navajo Indians, if any, using and occupying executive order lands were not entitled to participate in Navajo tribal councils elsewhere, or receive the benefits accruing to Navajos on other reservations. If they were not so entitled, this would be a circumstance tending to show that, whatever the nature of their use and occupancy of the executive order lands may have been, the Secretary of the Interior did not "see fit" to "settle" them on these lands. Such a circumstance would not, however, affect their right to be settled on the executive order lands if, in fact, the Secretary did see fit to settle them thereon. The illegality, if any, would not be in being settled upon and receiving benefits from the executive order lands, but in not thereafter surrendering benefits theretofore received from other reservations.

Accordingly, we do not regard this contention, whatever its merits, as calling for dismissal of the counterclaim. We express no view at this time as to the legal proposition at the foundation of this contention by plaintiff.

### Motions to Strike and for More Definite Statement

The counterclaim contains fourteen paragraphs. Plaintiff has moved to strike eight of these paragraphs (2, 3, 6, 7, 8, 9, 11 and 13) and almost all of another paragraph (10) as "immaterial and impertinent." Plaintiff seeks to strike one of these paragraphs (9) for the additional reason that the allegations are "scandalous, and are alleged for the purpose of creating prejudice against the plaintiff."

■ The allegations of the paragraphs sought to be stricken are immaterial and impertinent, plaintiff contends, because they deal at length with events long prior to 1882, or to events subsequent thereto which have no bearing on this case. In the latter category plaintiff places allegations concerning failure in assimilation, population statistics, attempts to create boundary lines, allotment programs, and the past attitudes of the Navajo Indians regarding division of the lands. The allegations of paragraph 9, to which plaintiff takes particular exception, relate to an asserted division of views among the Hopi Indians.

Defendant Paul Jones defends the form and content of his counterclaim but principally argues that the subject-matter of the motion can more appropriately be dealt with in a pretrial conference pursuant to Rule 16, Federal Rules of Civil Procedure, 28 U.S.C.A. He therefore urges that the motion be denied but that the matters raised therein be dealt with and disposed of at a pretrial conference.

Plaintiff's motion for a more definite statement asks that defendant Paul Jones make specific allegations concerning three matters set out in the motion. Defendant Paul Jones questions the propriety of requiring a more specific statement as to these matters. Again, however, he argues principally that the subject-matter of the motion can best be dealt with at a pretrial conference, and that with this in mind the motion should be denied at this time.

In our view the counterclaim contains a more extensive reference to events prior to December 16, 1882, than is necessary. Events prior to that date are relevant only to the extent that they tend to show what Indians or Indian tribes were using and occupying the executive order lands on that date, and as tending to explain the significance of subsequent events, including the action or inaction of the Secretary of the Interior.

Concerning allegations as to events which have occurred since December 16, 1882, we cannot now determine with assurance that the same are or are not relevant. Their pertinence, which may in some respects now seem doubtful, may later appear entirely appropriate. As an exception to what has just been said, we believe that the allegations of paragraph 9 of the counterclaim, beginning with the word "but" in line 16 on page 7 and continuing for the remainder of that paragraph, should be stricken as irrelevant.

It is our purpose to call for a pretrial conference pursuant to Rule 16, supra. At, or as a result of, such conference it is expected that a simplification of the issues will be obtained by formulating a statement of agreed facts and of the contentions of the parties, and by developing a list of disputed questions of fact and law. This will tend to simplify the issues and will probably require either the recasting of the pleadings or a merging and replacement of the pleadings in a definitive pretrial order.

In view of this prospect, we conclude that the motion to strike (except to the extent herein granted) and the motion for a more definite statement of the counterclaim should be held in abeyance at this time, for disposition after the results of such a pretrial conference are known.

The present form of the counterclaim, with the exception of the part of paragraph 9 which is to be stricken, need not unduly hamper the plaintiff in preparing a reply thereto, in view of the observations made in this opinion concerning the nature of the issues and the likelihood that the issues will be more sharply delineated at a pretrial conference.

An appropriate order is being entered.