Clarence HAMILTON, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe for and on Behalf of the Hopi Indian Tribe, Including All Villages and Clans Thereof, and on Behalf of Any and All Hopi Indians Claiming Any Interest in the Lands Described in the Executive Order Dated December 16, 1882, Plaintiff-Appellee,

v.

Peter MacDONALD, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe for and on Behalf of the Navajo Indian Tribe, Including All Villages and Clans Thereof, and on Behalf of Any and All Navajo Indians Claiming Any Interest in the Lands Described in the Executive Order Dated December 16, 1882, Defendant-Appellant,

William B. Saxbe, Attorney General of the United States, on Behalf of the United States, Defendant-Appellee.

Nos. 73-1151 and 73-2572.

United States Court of Appeals,
Ninth Circuit.

Sept. 12, 1974.

George P. Vlassis (argued), Brown, Vlassis & Bain, Phoenix, Ariz., for defendant-appellant.

John S. Boyden (argued), Boyden & Kennedy, Salt Lake City, Utah, for plaintiff-appellee.

Before BARNES and KOELSCH, Circuit Judges, and FIRTH,* District Judge.

## OPINION

KOELSCH, Circuit Judge:

These appeals concern a further melancholy episode in the long-continuing and bitter litigation between the Hopi and Navajo Indian Tribes. By way of background, it should be noted that the Congress, by Act of July 22, 1958, P.L. 85–547, 72 Stat. 403, sought to provide for a judicial resolution of the long-standing territorial dispute between the two tribes over a reservation in Northeastern Arizona; the legislation authorized either tribe to commence or defend a suit against the other (and the Attorney General on behalf of the United States, holder of the trust title to the lands in question) in the United States District Court for the District of Arizona

"for the purpose of determining the rights and interests of said parties in and to said lands and quieting title thereto in the tribes or Indians establishing such claims pursuant to such Executive order as may be just and fair in law and equity. The action shall be heard and determined by a district court of three judges in accordance with the provisions of title 28, United States Code, section 2284, and any party may appeal directly to the Supreme Court from the final determination by such three judge district court." 72 Stat. 403.

Thereafter the Hopi Indian Tribe brought suit, and a trial was held, extending over a period of months. The three-judge district court first decided that the determination of the tribes' equitable rights and interests in the reservation lands presented a justiciable question, and hence that the Act conferring jurisdiction was a proper exercise of Congressional power. Healing v. Jones, 174 F.Supp. 211 (D.Ariz.1959) (*Healing I*). It then decided, on the merits, that the Hopi were entitled to exclusive possession of a portion of the reservation [land management district 6], and that, as to the remainder [the joint use area]:

"The Hopi and Navajo Indian Tribes have joint, undivided, and equal interests as to the surface and sub-surface including all resources appertaining thereto, subject to the trust title of the United States.

"It is just and fair in law and equity that the rights and interests of the Hopi and Navajo Indian Tribes be determined in the manner just stated, and that the respective titles of the two tribes in and to the lands of the 1882 reservation be quieted in accordance with that determination." Healing v. Jones, 210 F.Supp. 125, 192 (D.Ariz.1962) (*Healing II*).

On direct appeal the Supreme Court, by decision "common to both" *Healing I* and *Healing II*, affirmed the district court (Jones v. Healing, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963) ), and the litigation temporarily came to rest. Some seven years later it resumed; on March 13, 1970, the Hopi Indian Tribe, alleging that it was still excluded from the joint use area, petitioned the district court for an order of compliance or writ of assistance to enforce the 1962 judgment.[1] The single-judge district

---

* The Honorable Robert Firth, United States District Judge for the Central District of California, sitting by designation.

1. The prayer for relief requested an order:
 "3. Directing the defendants to forthwith grant and permit the joint use and possession of the surface, including all resources, in and to all of the executive order reservation of December 16, 1882, lying outside of the boundaries of land management district 6, as defined on April 24, 1943 to the Hopi Indian Tribe and the Navajo Indian Tribe, share and share alike, and to remove such Navajo livestock from said lands as is necessary to accomplish such joint use without further damage to said lands.
 "4. Directing the clerk of this court to issue a writ of assistance to compel performance of the judgment of this court entered herein on September 28, 1962 and

court, being of the opinion that it lacked jurisdiction to issue process to enforce the judgment, denied the petition. We reversed, holding that the district court had jurisdiction, under P.L. 85–547 and the "All Writs" Act, 28 U.S.C. § 1651(a), to enforce the judgment by a writ of assistance. Hamilton v. Nakai, 453 F.2d 152 (9th Cir. 1972). We remanded the matter to allow evidence to be taken with respect to conditions existing in the joint use area, so that the district court might

> "Tailor the relief to be afforded to the facts that confront him, always bearing in mind that the objective is to achieve what the court has decreed, the exercise by the Hopi and the Navajo of their 'joint, undivided and equal interests as to the surface and subsurface and all resources appertaining thereto [in the lands in question], subject to the trust title of the United States.'" 453 F.2d at 162.

Certiorari was denied. 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972).

Following our mandate, the district court then held hearings, heard evidence, made Findings of Fact and Conclusions of Law, and on October 14, 1972, entered its Order of Compliance,[2] followed a few days later by a writ of assistance.

The matter is now here on the Navajo's appeals from these orders: The appeal in No. 73–1151 is from the Order of Compliance, and the appeal in No. 73–2572 is from those portions of the plan incorporated by the court in its order of April 23, 1973, which (1) restrict Navajo construction in the joint use area and (2) limit livestock grazing by members of the Navajo Tribe to one-half or less of the joint use area.

The defendant United States has not appealed; its position is that the issues now tendered by the Navajo Indian Tribe are substantially the same as those previously resolved by this court in Hamilton v. Nakai, *supra*. We shall consider the appeals in chronological order.

I. No. 73–1151—The Appeal from the Order of Compliance

A. The jurisdiction of the district court

 Appellant contends that the district court lacked subject-matter jurisdiction to order that the Hopi Indian Tribe be put in possession of one-half of the joint use area, on the theory that P. L. 85–547 did not confer jurisdiction on the three-judge district court to determine, as it did in *Healing II*, 210 F. Supp. at 192, that the Hopi Indian Tribe's joint and undivided interest is equal to that of appellant. While the Act authorized the district court to determine "the rights and interests of said parties" in the land in question and to quiet title accordingly, appellant nevertheless argues that Congress thereby authorized the district court to determine the *nature* of the tribes' rights and interests in the reservation, but not their *extent*.

Essentially the same argument was made in *Healing I*. There the defendant United States, from the premise that Congress cannot assign the court a non-judicial function, argued that the court lacked subject-matter jurisdiction because a determination of the tribes' "rights and interests" required a non-

---

> to allow the plaintiff, the Hopi Indian Tribe, to enter upon said joint use area, and with the Navajo Tribe jointly and equally use and benefit from the grazing forage and all other surface resources of said area, for the benefit of the respective members of said tribes until further order of this court."

2. Among other things, the order requires Navajo stock reduction; a program to restore the badly overgrazed range; a restriction of Navajo construction; a division of all income from rental or exploitation of the joint use area, including mineral resources; issuance of an equal number of grazing permits to members of each tribe; the issuance of a writ of assistance; and development of more specific plans to implement the broad outlines of the Order of Compliance.

justiciable political judgment. The court concluded otherwise. It decided:

> "[B]oth the identity of the holders of the vested equitable interest in these lands and the extent and nature of their respective holdings may be determined through the exercise of judicial power. . . . The conclusion necessarily follows that this court has jurisdiction to hear and determine this cause . . . ." 174 F.Supp. at 218.

To paraphrase, the court interpreted its assigned task of determining the "rights and interests" of the tribes to be that of "identifying the holders of the vested equitable interests . . . in determining the *extent* (emphasis added) and nature of the respective rights and interests of these holders, if any." 174 F.Supp. at 218. It decided that the task could be accomplished employing traditional judicial means, that an Article III, § 2 case or controversy existed, and that jurisdiction was proper. The conclusion that the court decided it had jurisdiction to determine the extent of the equitable interests follows inexorably. That the court has such jurisdiction is now the law of the case.

Moreover, in *Healing II* the court exercised that jurisdiction to determine that the two tribes had "joint, undivided, and equal interests" in the joint use area. As noted earlier, the Supreme Court affirmed that judgment. (373 U. S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963).) And this court in Hamilton v.

Nakai, *supra*, in response to the contention that the district court lacked jurisdiction to grant the relief sought by the plaintiff, observed that the relief sought, the possession of an equal portion of the joint use area, was the "enforcement of the decree quieting title in co-tenants, which the court did have authority to enter." 453 F.2d at 160. Particularly as no compelling reasons demonstrating those prior decisions in this case "palpably erroneous" have been advanced,[3] *see* Pachmayr Gun Works, Inc. v. Olin Mathieson Chemical Corp., 502 F.2d 802, at 805 (9th Cir., filed July 12, 1974) 1B J. Moore, Federal Practice ¶ 0.404[1], at 401–403, we will not now reconsider the court's jurisdiction.[4]

### B. The writs of assistance

 Likewise foreclosed is appellant's contention that the writ of assistance was improperly issued because such a writ does not lie against a party with a colorable claim to possession. In Hamilton v. Nakai, supra, this court expressly held that a writ of assistance to deliver joint possession in the joint use area to the excluded Hopi Indian Tribe was "agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). 453 F.2d at 157–158.[5]

### C. Potential equitable limitations on the relief ordered

Appellant's major contention with respect to the Order of Compliance is that under traditional equitable principles,

---

3. *Indeed, were the issue for us to decide, we would also conclude that the court had jurisdiction. The plain meaning of the words of the statute encompass a determination of the extent of each tribe's interest. We doubt Congress intended to authorize a suit to quiet title without a concomitant determination of the extent of the equitable interest to which title was being quieted. The legislative history relied on by plaintiff does not address the power of the court to determine the extent of each tribe's interest in jointly held, unpartitioned, areas.*

4. Appellant's corollary argument that the *extent* of the tribes' interests is a non-justiciable political question has likewise already been rejected. In *Healing I* the court held

that the extent of the interests could be determined and title quieted thereto by resort to "considerations of a kind which a court of equity may appropriately evaluate and apply." 174 F.Supp. at 218.

5. Moreover, appellant's contention is without merit. The cases cited by appellant, Burney v. Lee, 57 Ariz. 41, 110 P.2d 554 (1941), and Dixon v. Dixon, 140 Fla. 166, 191 So. 292 (1939), stand only for the commonplace historical proposition that a court of equity will not intervene to transfer possession of land until legal ownership has been determined. Here the joint ownership of the Hopi Indian Tribe has been established, and a writ of assistance clearly lies under the express terms of F.R.Civ.P. 70.

the relief granted is inappropriate for a court of equity.

### 1. The balance of hardships

■ Thus, appellant argues that the dislocation and attendant hardship which will be suffered by members of the Navajo Tribe if the Hopi are granted possession of their equal interest in the joint use area outweighs the hardship presently experienced by the Hopi, and therefore such relief should not be granted. That argument is essentially an effort to relitigate the determination made in *Healing II* that the Hopi are equitably entitled to share equally in the joint use area; such relitigation is precluded.

Appellant, in renewing the argument here, misconceives the scope of both the decision in *Healing II* and of this court's instruction on remand in Hamilton v. Nakai, *supra*. The decision in *Healing II*, affirmed by the Supreme Court and binding on us, did not leave open the question now urged—it decided that the Hopi are equitably entitled to use lands presently occupied solely by Navajo. The three-judge district court, authorized by P.L. 85–547 to quiet title "as may be just and fair in law and *equity*" (emphasis added), sat as a court in equity. *See* 453 F.2d at 156–157. As the lengthy opinion in *Healing II* demonstrates, that court had before it the very information, including the evidence as to exclusive *contemporary* Navajo use, the poverty and economic need of the Navajos, and their much larger population, which appellant now urges as the basis for *concluding* that enforcement of the decree is excessively harsh. That court

also had before it a great deal of evidence which appellant now ignores—evidence which in the balancing of equities favors the Hopi Indian Tribe. Included is a long history of the dispossession, with its attendant economic retardation, of the Hopi from lands to which they were legally entitled under United States treaty obligations; a dispossession resulting from the combined effects of Navajo intrusions and depredations, often in violation of Navajo treaty obligations, expediently sanctioned by bureaucratic indifference, and furthered by illegal governmental restraints on Hopi use of the reservation. With this evidence before it, the court determined that it was "just and fair in law and equity" for the tribes to share equally in the joint use area. In reaching that decision the court fully recognized and fairly considered the respective hardships confronting both the Navajo and Hopi.

The decision was not intended, as appellant seems to construe it, as an advisory opinion. Wisely or not, Congress assigned to the court the task of determining the respective rights of the tribes to the land in question and quieting title—presumably that was not intended as an idle task.[6] The court in *Healing II* indicated that the Hopi had a present right to use the jointly held areas, and that the court thought one of two alternatives would be followed: either, (a) that the Bureau of Indian Affairs would act to implement the congressionally mandated judicial resolution and seek to "fairly [administer] [the joint use area] as a joint reservation," or, (b) subsequent congressional action

---

**6.** The legislative history indicating that Congress did not authorize the court to partition lands in which the two tribes had a joint interest does not support appellant's position that Congress did not intend the court's determination of rights and interests to convey a right to possession. That history is primarily addressed to the question of how to divide up administrative jurisdiction over jointly held land, indicating that Congress thought that that issue should be resolved after being focused by a determina-

tion as to which lands were in issue. *See* 210 F.Supp. at 190. Nothing in the legislative history is inconsistent with the conclusion that until some subsequent action was taken, Congress intended the court's determination to convey to both tribes a right to use jointly held lands. If Congress, out of consideration for the respective economic needs of each tribe, then wished to allow use of a greater proportion to either tribe, it could simply compensate the dispossessed tribe.

would partition the area, assigning a portion of the joint use area to the reservation of each tribe.[7] 210 F.Supp. at 192.

Neither course was followed. The government procrastinated and the Navajo resisted the implementation of the court's decision. The Hopi therefore petitioned the court for aid, and this court, in Hamilton v. Nakai, *supra*, decided that the district court had jurisdiction to enforce the original decision. As our remand made clear, the remedy to be fashioned by the district court was one which put the Hopi in possession of that to which they were entitled under the decree in *Healing II*—a joint, undivided and equal share. 453 F.2d at 162. There was no occasion for the district court to "re-balance" the hardship imposed on individual members of the Navajo Tribe if the decision is enforced. That balance was struck in *Healing II*, and is now the law of the case.

Moreover, were we now initially reviewing the original determination that each tribe was entitled to share and share alike, we could not say that the relative hardship thereby imposed on the members of the Navajo Tribe so outweighed the alternative inequity and hardship which would be imposed on the members of the Hopi Tribe were they deprived of their interest that the decree constituted a reversible abuse of discretion. *See* Automatic Radio Mfg. Co. v. Ford Motor Co., 390 F.2d 113, 115–116 (1st Cir. 1968), cert. denied, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). The cases cited by appellant, such as New York v. Pine, 185 U.S. 93, 22 S.Ct. 592, 46 L.Ed. 820 (1902), and Madison v. Ducktown Sulphur, Copper & Iron Co., 113 Tenn. 331, 83 S.W. 658 (1904), are simply inapposite. Those cases stand for the commonplace proposition that injunctive relief will not be granted to protect an individual's legal rights if the effect of the equitable relief is to halt an enterprise on which many other men depend for their livelihood. As characterized by Professor Mechem, those cases ordain that:

> "[I]f many other peasants are to be injured by the granting of an injunction, the complaining peasant is remitted to his valuation, and no more. This is not Poor Man v. Rich Man; but rather Poor Man v. Poor Man. . . ."

Mechem, The Peasant in His Cottage: Some Comments on the Relative Hardship Doctrine in Equity, 28 So.Cal.L. Rev. 139, 144 (1955). Appellant surely must recognize that this is not such a case. This is poor men against other poor men, fighting against a long historical backdrop for an over-grazed, harsh, and inhospitable area which yields little above a subsistence living. Both tribes have historical claims to the area, and both undoubtedly have present economic need. Any solution is inevitably bound to cause suffering. The Order of Compliance and implementation plans attempt to minimize the economic dislocation caused the Navajo sheepherders, but the district court obviously cannot at the same time implement the decree protecting Hopi interests and not visit hardships on the Navajo, who presently use the entire area. Were the issue res nova, we could not say that the equal division struck was an abuse of discretion.[8]

### 2. Election of remedy

We now turn to appellant's contentions which are not governed by the doctrine of law of the case.

7. Presumably such a partition could be equal, or assign a greater proportion of the joint use area to the more populous Navajo Tribe, if compensation were paid to the Hopi Tribe for the interest thus taken.

8. As the Navajo expectation of exclusive possession of the area, and reliance thereon, has been fostered by a long history of governmental inaction and tolerance of Navajo settlement in the area, and by official illegal restraint of Hopi settlement, it is now undoubtedly past time for Congress to act to alleviate the hardship occasioned by the disruption of those expectations.

■ Appellant contends that the Hopi Tribe's attempt to collect grazing fees from the Navajo for grazing their livestock on the Hopi half interest constituted an election of damages which precludes later equitable relief. We disagree. The Hopi's yearly demand for rent merely reflected an effort to secure compensation for the Navajo's excessive previous year's use of an area from which the Hopi were unwillingly excluded, and cannot be interpreted as expressing a willingness to settle the Hopi claim for money. Nor, of course, did appellant in any way rely to its detriment on the expectation that year by year payments to the Hopi would settle the Hopi claim, as appellant consistently took the position that it had no obligation to pay the rent.

### 3. Difficulty of enforcement of the decree

■ Appellant also contends in substance that the Order of Compliance was improper because it will be insurmountably difficult to enforce. Again we disagree. While recognizing that the stock reduction order is most unpopular and may require extensive court supervision to enforce, we are confident that the district court will be able to solve such problems not resolved by the tribal officials and governmental officials charged with implementing the plan. As noted in Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1012 (1965):

> "The rule that a 'court of equity will not issue an unenforceable decree of injunction' comprehends two reasons for denying injunctive relief: that the court cannot discover violations of its decree, and that it does not have

the means to punish disobedience once discovered." (footnote omitted.)

Here neither condition exists. Given the stake of the Hopi Tribe in the implementation of the order, we are confident that the court has sufficient means of discovering violations. Nor does the order require anything impossible to be performed. If, as appellant appears to suggest, compliance will not be voluntarily forthcoming, then the district court possesses an ample reservoir of power to command respect for its orders.

### 4. No proof of ouster

■■ Appellant further attacks the equity of the Order of Compliance on the ground that a court of equity will not intervene, absent proof of an ouster, to grant possession to a co-tenant out of possession. "An ouster is a wrongful dispossession or *exclusion* (emphasis added) of a party from real property . . . It involves a question of intent." Newell v. Woodruff, 30 Conn. 492, 497, cited in Mastbaum v. Mastbaum, 126 N.J.Eq. 366, 9 A.2d 51, 53 (1939). Assuming *arguendo* that proof of an ouster is a necessary predicate to equitable relief,[9] that precondition was met here. The district court determined that the Hopi had been ousted, and that finding is not clearly erroneous—indeed, it is more than amply supported by the evidence. A careful review of the record reveals that the Hopi Tribe made demands for use of its joint interest to both the government and the Navajo Tribe, but that it has been excluded wrongfully from any but an insubstantial use of the joint use area by the acts of members and officials of appellant Tribe and of government officials.[10]

9. In fact, we doubt there is any such requirement, although in most cases in which a co-tenant out of possession must seek court aid, the requirement will probably be met. The cases cited by appellant are inapposite, dealing with the requirement that an ouster be shown for a co-tenant to obtain prescriptive rights through adverse possession, or for a co-tenant to become liable to his co-tenants for the value of the use and occupation of the land. When the co-tenant seeks only possession, nothing more than a present right to possession need be shown.

10. Our review of the record indicates that the district court's other findings are not clearly erroneous. Conflicts in testimony are for the district court to resolve. Therefore, appellant's contention that the Order of Compliance is not supported by competent evidence is without merit.

### 5. No proof of waste

 Appellant alternatively argues (presumably directed at the validity of the stock reduction and range conservation provisions of the relief) that: (1) in the absence of waste a court of equity will not provide injunctive relief to one co-tenant against the other, and that (2) no waste occurred in the Navajo's use of the joint use area. The contention is without merit. The district court found that members of appellant Tribe have so extensively overgrazed the range that 80 per cent of the joint use area is producing only 0 per cent to 25 percent of its maximum forage, and that the range is still deteriorating. That condition constitutes waste. Appellant's argument that the court's finding is improperly predicated on "Anglo", rather than Indian, range standards is fatuous. Appellant contends that Navajo grazing standards and customs dictate the most intensive possible use of the range, and that measured by that standard, Navajo grazing has been reasonable and no waste has occurred. Even if such indeed is the Navajo range standard, the short answer to the argument is that one co-tenant is not bound by the peculiar standards of the other co-tenant—he is entitled to protection of his rights in the estate as measured against an objective standard for determining reasonable use. The Hopi Indian Tribe is apparently willing to have waste measured against "Anglo" range standards, being of the opinion that standards which preserve the range are Indian standards as well. "A blade of grass cannot distinguish between an Anglo or an Indian." (Brief of Hopi Indian Tribe at 33.) Nor do we think that Navajo sheep prefer being thin. The district court acted properly in enjoining the continued overgrazing and ordering the implementation of range conservation measures.

### D. Indispensable parties

 We reject out of hand appellant's contention that creditors holding security interests in Navajo livestock presently grazed in the joint use area are indispensable parties, and that the action should be dismissed unless they are joined. The creditors are not conditionally necessary "persons to be joined if feasible," F.R.Civ.P. 19(a), much less indispensable parties. The subject matter of this action is the title to and possession of the land, not the livestock—the secured creditors have no interest in the land, and the rights of the parties to the land can be determined, and complete relief accorded them, in the absence of the secured parties. F.R.Civ.P. 19(a)(1). While the stock reduction provisions of the Order of Compliance affect the livestock which is mortgaged to the secured parties, the order does not affect title to the livestock or alter the legal validity of the security interests, and therefore does not "as a practical matter impair or impede [the secured parties'] ability to protect" their interests. F.R.Civ.P. 19(a)(2)(i). The secured parties, in the event their security is impaired, may proceed to seek whatever remedies against either the livestock or proceeds of sale they are afforded under their agreements.[11]

### E. Time limitation on process to enforce judgment

The final contention urged in No. 73–1151 is that the present supplementary proceeding to enforce the judgment in *Healing II* is barred by the combined operation of F.R.Civ.P. 69(a)[12] and A.

---

11. Consequently, the district court's exclusion of evidence relating to the secured parties was proper. Likewise, no error was committed with respect to the population tabulations, as the underlying records were not offered into evidence. In any event, the figures were relevant solely to an issue, the equitable balance of hardships, which had previously been resolved.

12. F.R.Civ.P. 69(a) provides in part:

"(a) In General. Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and proce-

R.S. § 12–1551(B).[13] Relying on Custer v. McCutcheon, 283 U.S. 514, 51 S.Ct. 530, 75 L.Ed. 1239 (1931), appellant argues that Rule 69 requires the district court here to adopt Arizona procedures and rules for enforcement of judgments, including A.R.S. § 12–1551(B), which extinguishes the right of execution on a judgment after the passage of five years.[14] Appellant concludes that the plaintiff is now barred from seeking supplementary aid to enforce the 1962 judgment.

Appellant is mistaken in the premise of the argument. Rule 69(a) does not apply to the judgment in *Healing II*. Rule 69(a) adopts state procedures on execution and supplementary proceedings only when the judgment is for the payment of money. NLRB v. Trans Ocean Export Packing, Inc., 473 F.2d 612, 615 (9th Cir. 1973); 7 J. Moore, Federal Practice ¶ 69.02, at 69–8; Wright and Miller, Federal Practice and Procedure; Civil § 3011, at 63 (1973) ed. Final process on equitable decrees ordering performance of specific acts is governed by F.R.Civ.P. 70, which does not provide for conformity to state practice. As the judgment in *Healing II* is not for the payment of money, and is governed by the last sentence of Rule 70, the limitation on execution provided by A.R.S. § 12–1551(B) is inapplicable.

It is, of course, somewhat anomalous that the Federal Rules of Civil Procedure, which purport to abolish the distinction between suits at law and equity. (F.R.Civ.P. 2), operate to adopt a state statute extinguishing the right to execu-

tion on a judgment at law for money, but not in the case of an essentially equitable decree. The distinction traces to the sources of present Rules 69(a) and 70. Before the adoption of the Federal Rules, the predecessor of Rule 69, 28 U. S.C. § 727, R.S. § 916, provided that "[t]he party recovering a judgment in any common-law cause" should have process on execution or in aid of the judgment in accordance with the practice of the state in which the court sat. R.S. § 916 had no application to equitable decrees.[15] Final process on the equity side of the federal courts was governed by Equity Rules 7, 8 and 9, *see* Rules of Practice in the United States Courts 436–443 (Dewhurst ed. 1919), the forerunners of present Rule 70.[16] *See* J. Moore, *supra*, at 70–21. However, Equity Rule 8 provided: "Final process to execute any decree may, if the decree be solely for the payment of money, be by a writ of execution, in the form used in the District Court in suits at common law in actions of assumpsit." Thus, through the combined effect of Equity Rule 8 and R.S. § 916, process to execute an equitable decree solely for the payment of money was, like that to execute a judgment at law, according to state practice. General Electric Co. v. Hurd, 171 F. 984 (C.C.Or.1909). *See* 7 Hughes, Federal Practice, Jurisdiction, and Procedure § 4511, at 224 (1931 ed.).

The drafters of the Federal Rules, in merging the two sets of procedures formerly applicable to federal courts sitting in law or equity, did not consider development of an entirely new series of

---

dure of the state in which the district court is held . . . ."

13. A.R.S. § 12–1551(B) provides:

"B. No execution shall be issued upon a judgment after the expiration of five years from the date of its entry unless the judgment is revived by affidavit or an action is brought thereon within five years from the date of the entry."

14. *See* Custer v. McCutcheon, *supra*, at 519, 51 S.Ct. 530; United States v. Tacoma Gravel and Supply Co., 376 F.2d 343 (9th

Cir. 1967); General Electric Co. v. Hurd, 171 F. 984, 988 (C.C.Or.1909).

15. Because Custer v. McCutcheon, *supra*, relied on R.S. § 916 to apply a state extinguishment of judgment statute, it does not stand as precedent for application of such a statute to a non-money judgment.

16. The independence of federal equitable remedies was a response to the wide variation in equitable relief available in state courts. *See* Guaranty Trust Co. v. York, 326 U.S. 99, 104–105, 65 S.Ct. 1464, 89 L. Ed. 2079 (1945).

rules on supplementary proceedings worthwhile. They therefore simply continued former practice. As most states had adequate supplementary proceedings to enforce money judgments, *see* J. Moore, *supra,* at 69–10, Rule 69(a) followed R.S. § 916 in adopting state practice for execution of a money judgment, whether it derived from a formerly legal judgment or equitable decree. Previously available federal remedies to enforce equitable decrees, including writs of assistance, continued, on the other hand, to be available under the terms of Rule 70, without reference to state practice.[17] Thus, a state statute such as A.R.S. § 12–1551(B), which extinguishes the right to execution on all judgments, whether for the payment of money or performance of specific acts, applies in federal courts, through Rule 69(a), only to money judgments. As the state policy (and adopted federal policy) behind the statute is the same in either event, and the Federal Rules recognize only one form of suit, application of A.R.S. § 12–1551(B) only to a money judgment incorporates a seemingly pointless distinction into the rules governing final process on federal court judgments. We are not at liberty to write the anomaly out of the Rules, and consequently appellant's contention that supplementary proceedings are barred must be rejected.

Moreover, the anomaly is less significant than appears at first glance because A.R.S. § 12–1551(B) probably applies to extinguish the right to execution on a federal court equitable decree in a diversity suit, not through operation of the Federal Rules, but because of the Rules of Decision Act, 28 U.S.C. § 1652. General Electric Co. v. Hurd, *supra,* at 988. *See* Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). *See* Wright and Miller, *supra,* § 2943, at 387 et seq. Thus, only non-money judgments in suits, such as the present one, in which federal jurisdiction is founded on some other basis than diversity of citizenship, are exempt from state limits on execution.

Even if we were free to do so, we would be highly reluctant to apply A.R.S. § 12–1551(B) to the case at bar. This is neither a suit in which the federal court is sitting as another court of the forum state, or even a suit in which, although jurisdiction is not based on diversity, the state has an interest, perhaps to be recognized out of comity, in protecting its citizen-litigant from an oppressive execution on a stale judgment. Because Congress possesses exclusive regulatory power over Indian tribes, U.S.Const. art. I, § 8, clause 3, because the consent of Congress is required for state courts to exercise jurisdiction over Indian territory, *see* 28 U.S.C. § 1360, and because the district court was authorized to exercise exclusive original jurisdiction over the present litigation, the matter is, in short, one in which the State of Arizona has very little cognizable interest, beyond the fortuity that the reservation is located in Arizona. Because of the historically unique "federal" status of the litigants, we see no reason to defeat the congressional policy of P.L. 85–547 in order to apply the state policy, absent some clear indication that Congress wishes to adopt it.

The judgment in No. 73–1151 is affirmed.

II. No. 73–2572—The appeal from the order of April 23, 1973, approving the government's implementation plans

Appellant raises two issues in this appeal. Neither has merit, nor requires extended discussion.

Appellant contends that paragraph 5 of the government's implementation plan

---

17. The same dichotomy is found in F.R.Civ. P. 64, 65, and 66, providing respectively for provisional remedies, injunctions and the appointment of receivers. The essentially legal provisional remedies of Rule 64 follow state practice; Rules 65 and 66 follow former federal equity practice. *See* J. Moore, *supra,* ¶64.02–64.03, at 64–6–64–8; ¶64.04 [3] at 64–19–64–21; Wright and Miller, *supra,* § 2932, at 346.

of January 17, 1973 (approved by the court by the April 23, 1973, order), which restricts Navajo construction in the joint use area,[18] effectively partitions the area and thus orders relief the court is without jurisdiction to provide. *See Healing II*, 210 F.Supp. at 192; Hamilton v. Nakai, *supra*, 453 F.2d at 160.

 The short answer is that the building restriction is not in any sense a judicial partition of the joint estate. A partition is "[t]he dividing of lands held by joint tenants . . . into distinct portions, so that they may hold them in severalty." Black's Law Dictionary 1276 (rev. 4th ed. 1968). "Partition . . . severs the unity of possession." Noble v. Beach, 21 Cal.2d 91, 130 P. 2d 426, 430 (1942). The restriction imposed on Navajo building applies in all parts of the joint use area, does not alter Navajo title, does not affect the Navajo right to "joint, equal, and undivided" possession in the entire area, nor, once the Hopi attain parity, to a voice in regulation of all new construction anywhere in the area. In short, rather than an effective partition, the building restriction is simply an appropriately designed equitable remedy to allow the Hopi the equal possession to which they are entitled. *See* Hamilton v. Nakai, *supra*, 453 F.2d at 160. In light of the fact that Hopi possession and use of the joint use area has been historically impeded by the exclusionary pressure of the overwhelmingly Navajo population living there, *see Healing II*, 210 F.Supp.

at 184, 188, the district court was well within its discretion in fashioning a remedy to prevent further Navajo influx during the period in which the Hopi are attaining parity in the area.[19]

Appellant's other contention, that the provisions of the implementation plan requiring stock reduction, range reconnaissance, the cancellation of all present grazing permits, and issuance of one-half of the future permits to members of each tribe, constitute a partition of the area, is without merit and does not require discussion save in one particular —the potential creation and use of grazing districts assigned exclusively to members of one tribe.

 Neither the Order of Compliance nor the implementation plans create exclusive grazing districts.[20] However, the testimony of Mr. Irving Schwartz, which is incorporated as a gloss on the implementation plans by the court's approval order of April 23, 1973, might be read to indicate that the government contemplates division of the joint use area into a number of grazing districts which will be divided between the two tribes in a manner which will allow each to graze land capable of sustaining the same number of animals, but with the permits in each district to be held exclusively by members of one tribe. R.T. of March 3, 1973, at 27 *et seq*.[21] Appellant argues that such an arrangement constitutes a proscribed partition. We disagree.

Establishment of grazing districts without more does not constitute a par-

---

18. The plan requires that new Navajo construction have a permit issued jointly by the two tribes, but does not impose the requirement on new Hopi construction until parity with existing Navajo structures is attained.

19. The parade of horribles listed by appellant is without foundation. The Hopi concede in their brief that (1) the district court's order may not be properly read to require a permit for repairs or maintenance of present structures; and (2) that the district court has continuing jurisdiction to remedy any Hopi abuse of the veto power.

20. Paragraph 1(e) of the government plan submitted December 14, 1972, and approved

by the court indicates that new grazing districts will be platted as part of the government's program for range restoration, and that they will be used to regulate future grazing. Nothing in that clause indicates that permits in such grazing districts will be issued exclusively to members of one tribe.

21. Mr. Schwartz also indicated that, if the tribes wished, "their" grazing districts could be contiguous, and adjacent to the reservation areas over which each tribe presently has exclusive jurisdiction. We are clear that voluntary agreement by the tribes to so locate the grazing districts would not constitute a judicial partition.

tition. Such districts are a recognized land-management device which may cut across or combine parcels of land under separate legal ownership in order to regulate range for grazing purposes. *See* 25 C.F.R. § 151.1(j). A grazing district does not alter either tribe's rights in the land—it simply facilitates government regulation of the land to protect it from waste.

Nor do we think exclusive grazing districts (assuming the implementation plan contemplates issuance of grazing permits in a particular district exclusively to members of one tribe) constitute an impermissible de facto partition. While as a matter of legal theory each cotenant is entitled to use of the entire estate, it is clear as a practical matter that Hopi and Navajo livestock cannot share the same spot on the range at the same time. The use of exclusive grazing districts is a reasonable means of allowing the Hopi their equal share of the range, and at the same time avoiding continued strife. Such exclusive grazing districts lack many elements of a partition. The right conferred to exclusive use of a particular area is only for grazing—it does not extend to other uses. Both tribes continue to have a joint, undivided, and equal interest in the entire area —members of one tribe may appropriately live in the exclusive grazing district of the other, gather wood there, or do anything else there, except use the land for grazing livestock. Moreover, the proposed grazing districts lack the element of permanence associated with a partition. It is clear from Mr. Schwartz' testimony that the boundaries of districts will be constantly changing as range restoration progresses. We therefore conclude that use of exclusive grazing districts does not constitute a partition, and is a reasonable and practical method of range conservation and of facilitating "the exercise by the Hopi and Navajo of their 'joint, undivided and equal interests.'" 453 F.2d at 162.

The judgment in No. 73–2572 is affirmed.