118 F.3d 1371
 47 Fed. R. Evid. Serv. 524, 97 Cal. Daily Op.
Serv. 5385,
97 Daily Journal D.A.R. 8731
Vernon MASAYESVA, Chairman of the Hopi Tribal Council of the
Hopi Indian Tribe, for and on Behalf of the HOPI
INDIAN TRIBE, Plaintiff-Appellee,
v.
Albert HALE, President of the Navajo Nation; Navajo Nation,
Defendants-Appellants.
Ferrell SECAKUKU, Chairman of the Hopi Tribal Council of the
Hopi Indian Tribe, Plaintiff-Appellant-Cross-Appellee,
v.
Albert HALE, President of the Navajo Nation; Navajo Nation;
United States of America,
Defendants-Appellees-Cross-Appellants.
Ferrell SECAKUKU, Chairman of the Hopi Tribal Council of the
Hopi Indian Tribe, Plaintiff-Appellee-Cross-Appellant,
v.
Albert HALE, President of the Navajo Nation; Navajo Nation;
United States of America,
Defendants-Appellants-Cross-Appellees.
 Nos. 94-17022, 94-17031, 94-17032, 95-15015 and 95-15029.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 17, 1995.
Decided July 8, 1997.
 
 Lois J. Schiffer and Katherine W. Hazard, Assistant Attorneys General, United States Department of Justice, Washington, DC, for intervenor United States.
 James M. Balogh and Dale S. Zeitlin, Zeitlin & Balogh, Phoenix, AZ, for appellees Hale and Navajo Tribe.
 Tim Atkeson, Arnold & Porter, Denver, CO, for appellant Hopi Tribe.
 Appeals from the United States District Court for the District of Arizona; Earl H. Carroll, District Judge, Presiding. D.C. Nos. CV-76-00936-EHC, CV-58-00579-EHC.
 Before: SCHROEDER, FLETCHER and RYMER, Circuit Judges.
 Opinion by Judge SCHROEDER; Partial Concurrence and Partial Dissent by Judge FLETCHER.
 SCHROEDER, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 These appeals are part of the long running and emotion scarring controversy between the Navajo Nation and the Hopi Tribe, in which the legislative, executive and judicial branches of the United States have all figured prominently. The dispute has centered on the ownership, control and use of nearly 2 million acres of the Native American reservation land occupying the northeast portion of Arizona and neighboring portions of Utah and New Mexico.
 
 
 2
 These particular cases arise out of specific remedial provisions of the Navajo-Hopi Settlement Act of 1974, 25 U.S.C. § 640d, et seq. (1980) (the "Settlement Act"). The Settlement Act allows partition of reservation land that the courts had declared jointly shared by both tribes, but which had been used for grazing exclusively, and excessively, by the Navajo. The Navajo overgrazing was fostered, in large part, by the Department of Interior, which refused to grant the Hopi grazing permits while simultaneously providing the Navajo with permits for more grazing than the land could reasonably support. Hamilton v. MacDonald, 503 F.2d 1138, 1146 n. 10 (9th Cir.1974) (explicitly affirming the district court's factual findings regarding the government's responsibility for Navajo overgrazing). In the 1974 Act, Congress expressly authorized litigation between the Hopi and the Navajo for enumerated damages; Congress intended for money to leaven the land-related inequalities between the Hopi and the Navajo.
 
 
 3
 The background of this litigation has been recited in nearly 35 years of court decisions and in numerous books and periodicals.[1] We provide only a summary here.
 
 
 4
 In 1882, President Chester Arthur by executive order created a 2.5 million acre reservation for the Hopi and "such other Indians as the Secretary of Interior saw fit to settle thereon." Exec. Order of Dec. 16, 1882, reprinted in, Healing v. Jones, 210 F.Supp. 125, 129 n. 1 (D.Ariz.1962), aff'd, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). Under this executive order, the Hopi Tribe enjoyed the right to use and occupy the entire reservation. By contrast, the Navajo who had already settled in the reservation did not gain any immediate rights to the land. Nevertheless, the Navajo continued to use and occupy parts of the 1882 reservation. By 1900, the Navajo population had increased to 1,826. Healing, 210 F.Supp. at 145. In 1920, it reached approximately 2,600, and by 1958, it exceeded 8,800. Id. Despite the Navajo's continued use of the reservation, their right to use the land during this period was unclear, and this caused an ongoing and bitter dispute.
 
 
 5
 In 1958, Congress authorized litigation to settle title to the 1882 reservation. Id. at 130. A three-judge district court thus examined the question in Healing and found that the Navajo had no right to use the land until 1931, when the Interior Secretary impliedly exercised his authority under the executive order to "settle" the Navajo on the reservation. Id. at 157. The Healing court further observed that all Navajo who immigrated to the reservation between 1931 and 1958 were also impliedly "settled" in the reservation. Id. at 169. Healing held that the Hopi occupied the area known as "land district 6" exclusively, but that the two Tribes held a joint, undivided and equal interest in the remainder, known as the Joint Use Area (JUA). Id. District 6 is 600,000 acres. The JUA is greater than 1.8 million acres.
 
 
 6
 Unfortunately, the 1962 order did not resolve the dispute. Between 1962 and 1972, the federal government continued to grant grazing permits to the Navajo, while rejecting all Hopi applications. Hamilton, 503 F.2d at 1146 n. 10. At the same time, the Navajo intimidated the Hopi and mutilated their cattle. Id. Together, the federal government and the Navajo excluded the Hopi from what Healing had declared a "joint use area."
 
 
 7
 The Hopi thus brought a supplemental action in which they obtained an order of compliance and a writ of assistance enforcing the Healing decision. Our decision affirming the order and the writ, Hamilton, 503 F.2d 1138, documents in greater detail the exclusion of the Hopi from the JUA. In Hamilton, we noted that although the permits enabled the Navajo only to eke out an existence, terrible and destructive overgrazing occurred nonetheless; the carrying capacity of the range was simply insufficient. Id. at 1145 (JUA is "an over-grazed, harsh and inhospitable area which yields little above a subsistence living").
 
 
 8
 The Hamilton order required the Navajo to, among other things, reduce its livestock and to allow the Hopi to share the land. Id. at 1142 n. 2. It also required the federal government to cancel all grazing permits and issue new ones, without giving either the Hopi or the Navajo permits for more than their half of the land's carrying capacity. Id. Additionally, the order required the government to adopt a plan to achieve the broad goals of the compliance order, including restoration of the range, within 90 days. Id. Both the government and the Navajo failed to do as ordered. In 1974, the Navajo were held in contempt of court. Sekaquaptewa v. MacDonald, No. Civ. 579 PCT (JAW) (D.Ariz. May 29, 1974), aff'd, 544 F.2d 396 (9th Cir.1976), cert. denied, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977). At that time, the Navajo's livestock exceeded, by approximately seven times, the JUA's carrying capacity. Id. at 3-4.
 
 
 9
 Against this background, Congress in 1974 passed the Settlement Act, authorizing partition by court order in the event mediation failed, which it did. A court order of partition was entered, and after appeal and remand, see Sekaquaptewa v. MacDonald, 575 F.2d 239 (9th Cir.1978), was reconfirmed.
 
 
 10
 The Settlement Act itself called for partition to achieve as equal a division as was practicable, 25 U.S.C. § 640d-5(d), while at the same time expressly directing that population centers should not be divided, 25 U.S.C. § 640d-5(b). The legislation also called for measuring the value of the land, for purposes of division, as if the grazing capacity were restored. 25 U.S.C. § 640d-5(d). In an effort to adjust any imbalance that might result from an unequal division, and to compensate the Hopi for both past exclusion from grazing the land and damage done to the land by Navajo overgrazing, Congress authorized several actions for money damages. So that the Hopi and the Navajo could sue one another and join the United States as a party, Congress waived immunity for all three sovereigns. 25 U.S.C. § 640d-5.
 
 
 11
 In Hopi Tribe v. Navajo Tribe, 46 F.3d 908 (9th Cir.) (the "rent case"), cert. denied, --- U.S. ----, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995), we affirmed a judgment awarding the Hopi rent, pursuant to § 640d-15(a) of the Settlement Act, for the post-partition presence of Navajo homesites on the Hopi half of the partitioned land. We also remanded the Hopi's award of rent for the post-partition (1979 to 1984) grazing of Navajo cattle and sheep on the Hopi half of the partitioned land, so that the district court could review the merits of the Navajo challenge to the award.
 
 
 12
 We now have three Settlement Act cases before us on appeal. We review first a judgment entered in favor of the Hopi, pursuant to § 640d-17(a)(2), for the "fair value of the grazing and agricultural use" by the Navajo of the Hopi's one-half interest in the JUA from 1962 to 1979; this is known as the "use case." The second appeal, known as the "owelty case", arises under § 640d-5(d), in which Congress authorized an action for the difference in value between the land awarded to the Hopi Tribe (the HPL) and the land awarded to the Navajo Nation (the NPL). The district court ruled the division was roughly equal and entered judgment denying any relief. In the third appeal, we consider an action pursuant to § 640d-17(a)(3) by the Hopi against both the United States and the Navajo to recover damage to the JUA caused prior to partition (the "damage case"). In the damage case, the district court entered judgment against the Navajo but refused to hold the federal government liable, finding that the United States had not acted unreasonably in its efforts to protect the JUA from damage.
 
 
 13
 The Navajo appeal the judgment in the use case and the Navajo and the Hopi both appeal the judgments in the owelty and damages cases. We affirm the use case in its entirety, and in large part, we affirm the owelty and damages cases as well. We discuss each case separately.
 
 II. THE USE CASE, No. 94-17022
 A. Background
 
 14
 The district court awarded the Hopi $18,187,132 for the Navajo's combined grazing and agricultural use of the Tribe's one-half interest in the JUA from 1962 to 1979. The case was litigated pursuant to 25 U.S.C. § 640d-17(a)(2), which allowed the Hopi to recover one-half the "fair value of the [Navajo] grazing and agricultural use" between the time of the JUA's creation (Healing decision of September 28, 1962) and the partition of the JUA on April 18, 1979.[2]
 
 
 15
 In this appeal, the Navajo's principal contention is that the Settlement Act itself is unconstitutional because it divests the Navajo of a vested property right to graze animals on the entire JUA. Additionally, the Navajo, for the first time on appeal, contend that the district court lacked jurisdiction because the determination of the fair value in this case constitutes a non-justiciable political question. The Navajo also challenge several evidentiary rulings and factual findings concerning the valuation of their grazing and agricultural use. We affirm the judgment.
 
 B. Constitutional Challenges
 
 16
 Relying on the due process clause of the Fifth Amendment, the Navajo argue that the Settlement Act undermines their property rights, as secured by the judgment in Healing. The Navajo also suggest that the statute is a retroactive impairment of their rights under the Contracts Clause of Article I. Whether the statute is constitutional is a question of law reviewed de novo, and as we have recently said, a court should invalidate a statutory provision "only for the most compelling reasons." Gray v. First Winthrop Corp., 989 F.2d 1564, 1567 (9th Cir.1993) (internal quotations omitted).
 
 
 17
 The common flaw in all of the Navajo's constitutional arguments is that the Navajo never had, either by court decree or contractual promise, an unfettered right to use the JUA to the exclusion of the Hopi. Rather, the Healing decision granted the Hopi and the Navajo joint and undivided interests in the JUA. Therefore the statute is a legitimate effort by Congress to implement the Healing decree, and to rectify wrongful conduct that has occurred in the wake of Healing.
 
 
 18
 The Navajo next argue, for the first time on appeal, that the district court lacks jurisdiction to determine the "fair value" of "grazing and agricultural use" because this is a non-justiciable political question. Assuming the Navajo did not waive the political question issue, their contention is without merit. The Navajo position boils down to an assertion that the determination of "fair value" is not an issue that courts are capable of resolving. See Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (issue may be a non-justiciable political question if it lacks judicially discoverable and manageable standards for resolution). The Navajo, however, recognize that courts frequently address the concept of "fair market value." See, e.g., Eales v. Environmental Lifestyles, Inc., 958 F.2d 876, 880 (9th Cir.1992), (calculating "fair market value" of architectural plans); cert. denied, 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992) Doherty v. C.I.R., 16 F.3d 338 (9th Cir.1994) (calculating "fair market value" of painting); Seravalli v. United States, 845 F.2d 1571 (Fed.Cir.1988) (estimating "fair market value" of real property). We see no material difference between evaluating "fair value," as set forth in the Settlement Act, and evaluating "fair market value," the more common standard. See also Koohi v. United States, 976 F.2d 1328, 1332 (9th Cir.1992) ("damage actions are particularly judicially manageable"), cert. denied, 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993).
 
 
 19
 For similar reasons, we are not swayed by the argument that the "fair value" determination is non-justiciable because it calls for a "policy determination of a kind clearly for non-judicial discretion." See Baker, 369 U.S. at 217, 82 S.Ct. at 710. Congress already made the policy decision that the Navajo should compensate the Hopi for excluding them from the JUA. What Congress left for the courts, calculating "fair value," is within the expertise of the judiciary.
 
 
 20
 Finally, the Navajo, again citing Baker, maintain that "the determination [of fair value] is impossible without expressing a lack of 'respect' due" the Executive Branch because the Secretary of the Interior decided not to charge the Navajo for grazing privileges. This argument is misplaced. As the Hopi point out, there is no indication that the Executive Branch ever took the position that the Navajo need not pay the Hopi for their extraordinary overgrazing of the JUA. The Executive Branch's decision that the Navajo need not pay the federal government for grazing permits is consistent with the Congressional mandate that the Navajo compensate the Hopi for overgrazing. In sum, we reject each of the Navajo's constitutional challenges.
 
 
 21
 C. Evidentiary challenges to expert testimony
 
 
 22
 The Navajo contest the district court's admission of Hopi expert Dr. John Workman's testimony regarding the fair value of Navajo grazing (as opposed to agricultural growth) on the JUA. They argue that Workman lacked sufficient foundation to support his testimony, since he is not a real estate appraiser but an economist. They further contend that his methodology did not satisfy the test for expert scientific testimony in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We review a decision to admit expert testimony for abuse of discretion. Dang Vang v. Vang Xiong X. Toyed, 944 F.2d 476, 480 (9th Cir.1991). "A trial court has broad discretion to admit and exclude expert testimony [under Fed.R.Evid. 702] and its decision will be sustained unless it is 'manifestly erroneous." ' Id. (citation omitted).
 
 
 23
 The court was well within its discretion to conclude that Dr. Workman is qualified to offer an opinion regarding the fair value of Navajo grazing. Dr. Workman has been a professor of Range Economics for twenty-five years, teaching courses in "rangeland appraisal" and "range economic analysis." He has written a textbook on range economics and dozens of peer-reviewed publications on subjects related to his testimony. He has been qualified as an expert on range economics in a case where he gave similar valuation testimony. See White Mountain Apache Tribe v. United States, 11 Cl.Ct. 614, 665-66 (1987) (qualifying Dr. Workman as "an expert in appraisal and range management" and characterizing his proposed measure of damages as "especially persuasive"), aff'd, 5 F.3d 1506 (Fed.Cir.1993), cert. denied, 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 191 (1994).
 
 
 24
 The district court thoughtfully examined the methodology and opinion of each expert, and accepted Dr. Workman's measure of damages only after making appropriate downward adjustments. The Navajo's reliance on Daubert is misplaced because Dr. Workman's testimony derives from his relatively straightforward application of range economics, rather than on a novel scientific theory. See Dang Vang, 944 F.2d at 482.
 
 
 25
 The Navajo also challenge the district court's decision to admit testimony from Hopi expert Robert Francy, an appraiser, on the value of corn grown on the JUA. Francy formulated his opinion from what others told him about corn prices. The Navajo argue that this constituted an improper use of inadmissible hearsay. However, the Navajo failed to raise any timely, specific hearsay objection to the expert's testimony and thus waived their right to assign error on appeal. See Fed.R.Evid. 103. The record, moreover, reveals that no statements from third parties were admitted for their truth. The third party statements only provided the Hopi expert with background information about corn sales, from which he fashioned his testimony. Such reliance is permissible, since experts in the field, i.e. appraisers, regularly go to third parties for sales figures, as the Hopi expert did here. See Fed.R.Evid. 703.
 
 
 26
 D. Challenges to the district court's valuation calculations
 
 
 27
 The district court separately valued Navajo "agricultural" use and "grazing" use, as contemplated by the statute. 25 U.S.C. § 640d-17(a)(2). The Navajo challenge the agricultural use valuation on two grounds. First, they argue that the district court clearly erred when it adopted Hopi expert Robert Francy's conclusion that the Navajo had actually farmed the JUA between 1962 and 1979. They contend that Francy's conclusion was based only on speculation. However, the record shows that Francy's conclusion was premised on two reports from the Bureau of Indian Affairs (BIA), aerial photographs, maps, documents, and personal spot checks. The court did not clearly err. Second, the Navajo contend that there was insufficient evidence to support a finding that there was a commercial market for the approximately 200,000 pounds per year of corn attributable to Navajo farming. This argument, however, spuriously assumes that the corn consumed by the Navajo themselves lacks value. The evidence clearly established that the market for most of the corn was in the nature of personal consumption, and only a small percentage of the crops were sold commercially. Thus, the evidence supported a finding that there was a market for the corn.
 
 
 28
 The Navajo challenge to the district court's calculation of the value of Navajo grazing on the JUA is slightly more complicated than their other contentions, but no more valid. First, the Navajo contend that the value of their grazing on the JUA should be computed from the land's carrying capacity, i.e., the amount of grazing the land can sustain without irreparable damage. This is how ranch land is typically valued for leasing purposes. Because longtime Navajo overgrazing drastically decreased the carrying capacity of the JUA, the rental value of the land between 1962 and 1979 was only one-fifth the typical rate in Arizona. The district court thus rejected the Navajo's approach and estimated the actual amount of grazing from the number of Navajo animals on the JUA. At times, actual grazing by Navajo livestock exceeded the carrying capacity by approximately seven-fold. The district court then valued the Navajo's use of the land by reference to the actual amount of Navajo grazing. The Navajo argue that in so doing, the district court improperly charged them more than they would have paid on the open market, as the open market rate is pegged to carrying capacity, a lower figure. As the Hopi point out, consumption beyond the carrying capacity should exact a premium charge. The district court did not clearly err when it charged the Navajo for this excessive use.
 
 
 29
 Second, the Navajo argue that the court overestimated the number of animals on the JUA. The district court counted the number of animals in units of cattle. For most years, the court converted sheep to cattle using a ratio of five sheep per one head of cattle, and adjusted downward for low animal weight. The court did not make these adjustments for 1966, 1968 through 1971 and 1974, because it lacked information about the number of sheep and the weight of cattle on the range. The Navajo contend that the district court should have made the 5:1 conversion and the weight adjustment during these years because it had sufficient information. The record, however, reveals that the court did not have precise sheep counts during those years, and therefore could not make an accurate conversion. In addition, the court had information on only three cattle sales for those years, and therefore could not accurately adjust downward for low animal weight. The court's estimates of the number of animals on the JUA were not clearly erroneous.
 
 
 30
 Third, the Navajo argue that the district court erroneously valued grazing by using adjusted private Arizona lease rates instead of federal land lease rates. There were, however, no federal rates between 1962 and 1972; therefore, rates for those years could be estimated only through statistical projections. Moreover, federal rates reflect policy decisions, not market dynamics. The district court's use of private Arizona rates was not clearly erroneous. We affirm the district court's award to the Hopi in the use case.
 
 
 31
 III. THE OWELTY CASE, Appeal Nos. 94-17031,
 
 95-15015
 A. Background
 
 32
 Owelty is a sum of money paid by one former joint tenant to another after a partition results in an unequal division of their land; the owelty compensates the former tenant who received the lesser value for the disparity. See Black's Law Dictionary (4th Ed.); 68 C.J.S. Partition § 142 at 232-3 (1950 & 1988 Supp.); 59A Am.Jur.2d Partition §§ 2, 253 (1987). In this owelty case, the district court held that after partition there was no statistically meaningful difference in value between the Hopi half of the land and the Navajo half. Thus, it ordered no owelty award.
 
 
 33
 The owelty action was brought pursuant to § 640d-5(d) of the Settlement Act, which authorizes the district court to award damages for any difference in value between the halves of the partitioned land with "improvements and grazing capacity fully restored."[3] The Hopi appeal from the judgment, arguing that the district court undervalued the Navajo land because it misinterpreted the owelty statute. The Hopi also contend that they are entitled to prejudgment interest, if they succeed on their claim for owelty.
 
 
 34
 In the cross-appeal, the Navajo assert that the Hopi should be judicially estopped from seeking owelty. Moreover, the Navajo want an owelty payment from the Hopi, and argue that the Hopi got the better land. We hold that the district court erred in its interpretation of the statute and remand for a determination of the amount of owelty due the Hopi. We affirm the district court's denial of owelty to the Navajo. We further hold that the Hopi are not judicially estopped from seeking owelty, and that they must receive prejudgment interest on it.
 
 B. Improvements
 
 35
 The principal legal contention we must resolve is the Hopi's argument that the district court misconstrued the statutory language directing that the value of the partitioned land "shall be based on not less than its value with improvements and its grazing capacity fully restored." § 640d-5(d). The district court determined the land's worth with its grazing capacity fully restored and with only those improvements that, as described by the district court, were necessary to restore the grazing potential to the maximum extent feasible. Presumably, the district court was referring to improvements such as roads, stream diversions, irrigation canals, and fences, which can help improve the land's grazing capacity.
 
 
 36
 On appeal, the Hopi assert that the district court wrongly interpreted the plain language of the statute calling for the valuation of "improvements." The Hopi argue that the district court should have valued all improvements, including hospitals, schools, churches, hogans, trading posts and other structures. The Hopi contend that these improvements all contribute to the value of the land as an Indian reservation. At trial, the Hopi expert agreed that the land should be appraised as an Indian reservation, with potential for, inter alia, agriculture, grazing, rural residential habitation and limited commercial enterprise. The Navajo's competing expert took the view that the land should be valued strictly as a cattle ranching operation and that most buildings were of no significance.
 
 
 37
 The legislative history does little to answer the question of whose valuation is correct, as it refers to improvements without ever giving any indication of what type of improvements Congress contemplated. See, e.g., H.R.Rep. No. 909, 93rd Cong., 2d Sess. (1974); S.Rep. No. 1177, 93rd Cong.2d Sess. (1974). Thus, we focus on the statute itself. The Navajo's valuation appears to do violence to the statutory language, for it ignores the Congressional directive to value "improvements." The district court's view that "improvements" should be limited to those necessary to restore the land to full grazing capacity also finds no support in the statute. Indeed, the statute's conjunctive structure suggests that an independent value should be assessed for "improvements" and for the land fully restored. Moreover, Congress did not qualify the word "improvements;" the statute contains no express limitation on the type of improvements that can comprise the value of the partitioned land, or the purpose that the improvements must serve before they can be included in value.
 
 
 38
 Nevertheless, we cannot add the full value of the buildings on the NPL to the value of the Navajo land, since most of the structures on the NPL are privately owned and are not part of the real property that was given to the Navajo Nation at partition. For example, the residences, primarily hogans or smaller structures, are owned and were paid for by individual Navajo. The same is true of the barns, sheds and corrals on the NPL. Moreover, even if these structures were not privately owned, they likely would have no appreciable value for owelty purposes, as the Hopi expert testified that the Hopi routinely demolish such structures once the Navajo have abandoned them.
 
 
 39
 The buildings on the NPL that have the most significant intrinsic value include schools and hospitals that belong to the United States and which, like the private residences, cannot be added directly to the value of the NPL because they were not partitioned to the Navajo. The same logic applies to churches and missions on the NPL, which are owned and managed by their respective religious organizations, and to structures erected on the NPL by third party entrepreneurs, such as the Peabody coal mining operation.
 
 
 40
 The Hopi therefore alternatively contend that the district court should not value the improvements themselves, but rather the land's enhanced value because those improvements are on it. We believe this is the only interpretation of the statute that gives meaning to all of its terms and the one that best accords with Congressional intent. The district court concluded that "there is no competent evidence that the NPL had more improvements than the HPL which were necessary to restore the partitioned lands" because it had first (erroneously) interpreted what "improvements" means. Consequently, the district court made no findings of fact regarding the contributing value of such things as schools, churches, and hospitals, to the value of the JUA. Nor did the court evaluate the methodology underlying the competing expert opinions about such contributing value. For this reason, we remand to the district court so that, guided by the correct interpretation of "improvements," it may consider and evaluate the conflicting expert opinions, and decide what owelty payment, if any, is due the Hopi based on the contributing value of all improvements.
 
 C. Grazing capacity
 
 41
 Finally, we turn to the Navajo's Rule 59(e) motion, essentially a request for owelty, which the district court denied. The Navajo argue that because the district court accepted the opinion of an expert who opined that the HPL fully restored would support more grazing than the NPL fully restored, the district court was obligated to award the Navajo owelty relief. The district court, however, correctly noted in accepting that opinion that the same expert also testified to a 10 to 15 percent margin of error in his restored grazing capacity figures. Any difference between the HPL and the NPL was within that margin of error, and hence not statistically relevant. The district court did not err in denying the Rule 59(e) motion.
 
 D. Judicial Estoppel
 
 42
 The doctrine of judicial estoppel bars a party from taking inconsistent positions in the same litigation. Morris v. State of Cal., 966 F.2d 448, 452 (9th Cir.1991), cert. denied, 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). The Navajo argue that the Hopi should be judicially estopped from seeking owelty because, prior to partition, the Hopi represented to the district court that the partition would not result in an owelty payment. We agree with the district court that this argument should be rejected because no court ever adopted the original Hopi position that the partition would not result in an owelty payment. See Milgard Tempering, Inc. v. Selas Corp., 902 F.2d 703 (9th Cir.1990) (court must adopt position for judicial estoppel to apply).
 
 E. Prejudgment interest
 
 43
 Our decision here is controlled by Hopi Tribe, 46 F.3d 908. There, we held that § 640d-17(e) of the Settlement Act, which allows the Hopi and the Navajo to sue one another for all remedies available in federal district court, allows for recovery of prejudgment interest. Although that decision was reached in the context of a suit for fair rental value of post partition use of the HPL by the Navajo, its logic applies with equal force in this context. Thus, we hold that the Hopi are entitled to prejudgment interest.
 
 F. Conclusion
 
 44
 We therefore reverse the district court's denial of owelty and remand so that the Hopi may seek compensation for any disparity in value and prejudgment interest thereon. In all other respects, we affirm the district court's valuation of owelty.
 
 
 45
 IV. THE DAMAGES CASE, Appeals Nos. 94-17032,
 
 95-15029
 A. Background
 
 46
 In the action giving rise to these appeals, the Hopi sued the Navajo and the United States to recover for damages to the HPL caused by Navajo overgrazing prior to the 1979 partition. The district court held that while the conduct creating liability occurred before the 1979 partition, the Hopi's compensation would be measured by the value of the lost grazing opportunity that the Hopi suffered after partition. In other words, the Hopi could recover the post-partition difference in value between the land "as is" and the land fully restored. None of the parties contest this ruling on appeal.
 
 
 47
 After trial, the district court awarded the Hopi $3,167,388.84 in damages against the Navajo, and absolved the United States of liability on the ground that the government made reasonable efforts to protect the range. Both the Hopi and the Navajo challenge the district court's calculations. Their contentions lack merit, except for the Hopi complaint that the district court wrongly denied damages for lost grazing opportunity on lands that the Hopi set aside for wildlife. Accordingly, we remand so the district court can add the value of that lost opportunity to the damages award. Further, the Navajo argue that the United States should be held liable for its failure to adequately protect the range. We agree with the district court's application of a reasonableness standard and affirm the district court's denial of liability on the basis of factual findings that are not challenged as clearly erroneous.
 
 B. Calculation of damages
 
 48
 We turn first to the contentions concerning the district court's calculation of damages. The court computed the lost grazing opportunity using the following method. First, it estimated the fully restored annual grazing capacity of the HPL, finding that the HPL could be restored to excellent condition, but maintained as grazing land at only 75% of that condition. The Hopi challenge this finding on appeal. Second, the court determined that the HPL would be fully restored by 1995. Third, it estimated the total lost grazing capacity by calculating the difference between the fully restored grazing capacity and the actual annual grazing capacity for each year between 1979 and 1995, and then adding up the lost opportunity for each of these years. Fourth, it put a price on the lost grazing opportunity by referring, as in the use case, to adjusted private Arizona lease rates instead of federal lease rates. Finally, the court discounted the future damages to their present value. These three steps are not challenged.
 
 
 49
 When estimating the total lost grazing capacity, the court made several adjustments that the Hopi challenge here. It decreased its estimate of the lost grazing opportunity by making "management cuts" to account for the Hopi practice of grazing cattle instead of sheep. Sheep typically graze all available forage. Cattle, by contrast, do not spontaneously graze hard-to-reach forage, prefer certain kinds of terrain over others, and tend to congregate within one-and-a-half miles of water sources. Because cattle use less acreage, reasoned the district court when making the cuts, the Hopi lost less grazing opportunity than they would have if they grazed sheep. In addition, the court excluded the lost opportunity associated with seven range units that the Hopi reserved for wildlife rather than livestock; we refer to these exclusions as the "vacant range cuts."
 
 
 50
 The district court also made an adjustment that the Navajo challenge on appeal: it increased its estimate of lost grazing to account for the eventual completion of water development programs on the HPL. Completion of these projects increases the acreage accessible to cattle, thereby increasing the Hopi's lost opportunity.
 
 
 51
 We address the Hopi challenges first. The Hopi argue that the district court clearly erred in setting potential grazing capacity at 75%, rather than 100%, of excellent condition. However, several experts, including the Hopi's own, testified that the range could not be grazed at 100% of excellent condition. The court's finding was not clearly erroneous.
 
 
 52
 The Hopi also challenge the district court's management and vacant range cuts, arguing that the value of the lost grazing opportunity should be premised on the Hopi's right or opportunity to use the land, rather than how the Hopi actually used the land. They contend that the management cuts were inappropriate because they could have fully utilized the HPL's grazing capacity by raising sheep instead of cattle. Further, they contend that the vacant range cuts were inappropriate because they could have used their seven vacant range units for grazing, but chose to leave that land fallow in order to accelerate the restoration process. The Navajo and the government respond that damages should be limited to real opportunity costs, which are tied to the Hopi's actual use of the land.
 
 
 53
 The Restatement (Second) of Torts § 929, concerning Harm to Land from Past Invasions, provides the most relevant authority. It states that "[i]f one is entitled to judgment for harm to land resulting from past invasion ..., the damages include compensation for ... the loss of use of the land...." Comment d to § 929 explains that "the plaintiff is entitled to recover for the past or prospective loss of use ... as stated in § 931." (emphasis added). Comment b to § 931 provides:The owner of the subject matter is entitled to recover as damages for the loss of the value of the use, at least the rental value of the ... land during the period of deprivation. This is true even though the owner in fact has suffered no harm through the deprivation, as when he was not using the subject matter at the time .... The use to which ... the land is commonly put ... [is] to be taken into consideration as far as [it] bear[s] upon the value of the use to the owner or the rental value.
 
 
 54
 Restatement (Second) of Torts § 931 cmt. b (emphasis added). Thus, under the Restatement the value of the lost grazing opportunity turns on the type of use to which the land was "commonly put." The record reveals that the Hopi have "commonly put" the HPL to use for grazing cattle, rather than sheep. The district court made the management cuts to exclude forage that was inaccessible to cattle. This was in accordance with the Restatement principle. We affirm the district court's management cuts.
 
 
 55
 Our result differs with respect to the vacant range cuts. Unlike the acreage excluded by the management cuts, the land excluded under the vacant range cuts was accessible to cattle. Thus, the question is whether the Hopi should be awarded lost opportunity damages for land that could have been put to its common use, but which the Hopi chose not to use in the customary manner. We hold that the Hopi should be awarded damages for lost grazing opportunity on the vacant ranges. As the Restatement explains, an owner can suffer deprivation even if the owner "was not using the subject matter at the time." Id. We therefore reverse the district court's vacant range exclusion and remand for inclusion of the lost grazing opportunity on the vacant range units in the Hopi's damages award.
 
 
 56
 The Navajo argue that the upward adjustment for the future completion of water development programs constituted clear error because such programs will have no impact on Hopi grazing. They contend that the programs are saddled with inadequate funding and resistance from the Hopi themselves, preventing their development. However, the Navajo's own expert testified that these programs had made substantial progress, and the Hopi's expert recommended the upward adjustment. The court did not clearly err in following that recommendation.
 
 
 57
 The Navajo also argue that the damages award was excessive. The Navajo and the Hopi both agree that the damages award, coupled with the post-partition rent, should equal the fully restored value of the HPL. In other words, they agree that the value of the HPL fully restored is equal to lost grazing opportunity (damages) plus available grazing opportunity (rent). The Navajo point out, however, that the payment they made in the rent case, Hopi Tribe, 46 F.3d 908, plus the damages award here, adds up to more than the worth of the fully restored HPL. From this the Navajo conclude that the damages award is excessive. The Navajo's argument is without merit. The rent award included considerations unrelated to actual grazing, such as financial penalties for trespassing livestock. These penalties and other factors unrelated to grazing, rather than an excessive damages award, are what cause the appearance of overcompensation. The district court did not clearly err in finding that the damages award was not excessive.
 
 
 58
 Finally, the Navajo challenge the testimony of expert John Workman, contending, as they did in the use case, that he is not qualified. See supra II.C. We reject their contention for the same reasons articulated in part II.C. Id.
 
 C. Federal Government Liability
 
 59
 Finally, we address the question of the United States' liability. We must decide whether the United States should bear any fiscal responsibility for the tragedy of these commons. The district court held that if the United States negligently failed to protect the JUA, the United States, together with the Navajo, would be jointly and severally liable for damages to the land. The district court concluded that the government was not negligent, stating that the Hopis failed to sustain their burden to show "that the damage to the HPL was caused by unreasonable government action or inaction."The Hopi appealed that judgment, arguing that the district court erred by using negligence, rather than strict liability, as the standard for government liability. After oral argument in these appeals, the United States settled with the Hopi for $2,400,000, and the Hopi moved to abandon the portion of their appeal contesting the decision in favor of the government. We granted that motion, but allowed the Navajo to rely on the arguments in the Hopi briefs with regard to joint liability. Additionally, the Navajo contend that the United States should be exclusively liable.
 
 
 60
 We agree with the district court that the government's behavior should be evaluated using reasonableness as the yardstick. The district court assessed government liability in accordance with the only available provision addressing damages to the land, § 640d-5(d).[4] That section provides that the government will be liable for damages to the land if the government fails "to provide protection where such protection is or was required by law or by the demands of the trust relationship." Protections required by law are coterminous with those required by the trust relationship. See United States v. Mitchell, 463 U.S. 206, 224, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983) (statutory and regulatory provisions define contours of federal government's trust obligations when it assumes responsibility as a trustee for Indian lands); accord 25 C.F.R. 153.3 (1976) (regulations are promulgated to "carry out the Secretary's trust responsibility" over the JUA). Since the government's liability is predicated on trust obligations, it need take those protective measures that a reasonable or prudent trustee would take. Navajo Tribe v. United States, 9th Cir. 336, 400 (1986); Restatement, (Second) Trusts, § 176.
 
 
 61
 The district court may well have erred in describing the appropriate standard as a negligence, or reasonable person standard, rather than a fiduciary, or reasonable trustee standard, but the Hopi have not argued that the district court measured the government's fault by the wrong standard. Rather, the Hopi ask that the government be held strictly liable, without regard to fault. We therefore hold that the district court did nor err in determining the government's liability using the reasonableness standard rather than a standard of strict liability. The Hopi do not challenge the findings as clearly erroneous.
 
 CONCLUSION
 
 62
 We affirm the entire judgment of the district court in the use case. In the owelty case, we remand so that the district court may determine the amount of owelty, if any, due the Hopi based on the value of the land and the contributing value of improvements, and affirm in all other respects. In the damages case, we reverse the district court's decision not to credit the Hopi for lost opportunity on the seven vacant range units set aside for wildlife, but otherwise affirm the judgment.
 
 
 63
 AFFIRMED in part, REVERSED and REMANDED in part. Each party shall bear its own costs on appeal.
 
 
 64
 FLETCHER, Circuit Judge, concurring in part and dissenting in part.
 
 
 65
 I concur substantially in the majority's opinion.
 
 
 66
 I respectfully dissent, however, from the majority's refusal to reverse the district court's holding that the United States is not liable for failure to protect the HPL from overgrazing prior to partition in 1979.
 
 
 67
 The majority concludes as do I that the district court applied the wrong standard in assessing the government's liability. The district court held the government to a negligence standard, holding the Hopi responsible for proof that "the damage to the HPL was caused by unreasonable government action or inaction," rather than to the duty of a reasonable trustee, who is under an affirmative duty "to the beneficiary to use reasonable care and skill to preserve the trust property." (Restatement (Second), Trusts, § 176(1959)) (emphasis added).
 
 
 68
 The government's obligation as trustee required it to take those protective measures that would have prevented the spoliation of the trust land by overgrazing-the very conduct by the Navajo that proper oversight by the government should have prevented. The government as trustee had affirmative duties of oversight-an obligation to investigate and to be informed and to act affirmatively to assure the protection of the grazing land-a fragile ecosystem-from overgrazing. The government's obligation, in short, was to prevent the Navajo from doing the very acts that imposed liability on the Navajo.
 
 
 69
 My disagreement stems from the majority's conclusion that despite the district court's error, its holding should stand because the Hopi have not challenged on appeal the district court's finding that the government acted reasonably.[1] But that finding of reasonableness was in the context of the inappropriate negligence standard-what is reasonable conduct for a non-fiduciary is not necessarily reasonable conduct for a trustee since the trustee has an affirmative duty to protect and preserve the trust res. That is the very point the Hopi make: they assert that the government breached its fiduciary duty to protect the HPL from overgrazing. They offer the proof of the breach in the condition of the land, a condition directly traceable to the overgrazing.
 
 
 70
 "Reasonableness" as a standard is only meaningful when defined in context; a "reasonable" trustee must clearly do more than a "reasonable" person would to prevent the destruction of trust property.
 
 
 71
 I would therefore remand to the district court so that it could determine the government's liability by properly applying the reasonableness standard to which a trustee is held. Since the Hopi did not challenge the factual findings below as clearly erroneous, whether the government fulfilled its obligations as trustee should be determined in light of those findings.
 
 
 72
 I do not ignore the fact that the relationship of the United States to the Navajo and the Hopi is unique. It owes trust duties to each; if it failed in its duties, its failures were to both (failure to protect the trust property to the detriment of the land and to both the Hopi and the Navajo; failure to oversee and impose proper controls on the grazing practices of the Navajo).
 
 
 73
 Upon remand, I would require the district court to determine and assess the government's liability and fiscal obligations and determine the effect, if any, on the amount owed to the Hopi by the Navajo.
 
 
 74
 Accordingly, I dissent.
 
 
 
 [1]
 See, e.g., Emily Benedek, The Wind Won't Know Me: A History of the Navajo-Hopi Land Dispute (1992); Jerry Kammer, The Second Long Walk: The Navajo-Hopi Land Dispute (1980); Charles Miller, The Navajo Hopi Relocation and the First Amendment Free Exercise Clause, 23 U.C.S.F. L.Rev. 97 (Fall, 1988); Healing v. Jones, 210 F.Supp. 125, 129 n. 1 (D.Ariz.1962), aff'd, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963); Hopi Tribe v. Navajo Tribe, 46 F.3d 908 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995); Hamilton v. MacDonald, 503 F.2d 1138 (9th Cir.1974)
 
 
 [2]
 § 640d-17. Actions for accounting, fair value of grazing, and claims for damages to land
 (a) Authorization to commence and defend actions in District Court
 Either tribe, acting through the chairman of its tribal council, for and on behalf of the tribe, including all villages, clans, and individual members thereof, is hereby authorized to commence or defend in the District Court an action or actions against the other tribe for the following purposes if such action or actions are not settled pursuant to section 640d-2 or 640d-3 of this title:
 (2) for the determination and recovery of the fair value of the grazing and agricultural use by either tribe and its individual members since the 28th day of September 1962 of the undivided one-half interest of the other tribe in the lands within the joint use area, together with interest at the rate of 6 per centum per annum compounded annually, notwithstanding the fact that the tribes are tenants in common of such lands ...
 
 
 [3]
 Section 640d-5(d) of the Settlement Act provides:
 In any partition of the surface rights to the joint use area, the lands shall, insofar as is practicable, be equal in acreage and quality: Provided, That if such partition results in a lesser amount of acreage, or value, or both to one tribe such differential shall be fully and finally compensable to such tribe by the other tribe. The value of the land for the 18 purposes of this subsection shall be based on not less than its value with improvements and its grazing capacity fully restored: Provided further, That, in the determination of compensation for any such differential, the Federal Government shall pay any difference between the value of the particular land involved in its existing state and the value of such land in a fully restored state which results from damage to the land which the District Court finds attributable to a failure of the Federal Government to provide protection where such protection is or was required by law or by the demands of the trust relationship.
 
 
 [4]
 Section 640d-5(d) is an owelty provision. However, it also discusses the government's liability for the difference in value between the land "as is" at the time of partition and the land fully restored. That is, 640d-5(d) covers damages as well as owelty. The parties on appeal do not dispute the district court's reliance on this section
 
 
 [1]
 After oral argument in these appeals, the United States settled with the Hopi for $2,400,000, and the Hopi moved to abandon this portion of their appeal. We granted that motion, but allowed the Navajo to rely on the Hopi's arguments with regard to joint liability