IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-40864

_____

JOHN B. GORDON; ET AL

                                        Plaintiffs

JOHN B. GORDON; MARIE GORDON; K.M. SHIPLEY; T.E. MOOR, III; GLENN
DAVID MOOR; MARIAN CAFFREY CAMPBELL; BILLY BRYANT, et ux; ANN
BRYANT; ROY STEINHAGEN; KIM STEINHAGEN; CHARLES FONTENIER; WANDA
FONTENIER; JAMES D. HEARN; SANDRA HEARN; PATRICK A. GREEN; THERESA
GREEN; RALPH SAUER; MARGARET JO SAUER,
                                        Plaintiffs-Appellants,

                              versus

STATE OF TEXAS, c/o Honorable Antonio Garza, Secretary of State;
GULF COAST ROD &, Gulf Coast Rod & Reel Club; COUNTY OF GALVESTON;
TEXAS GENERAL LAND OFFICE; TEXAS PARKS & WILDLIFE; GULF COAST ROD,
REEL AND GUN CLUB; WAYNE STUPKA; DAVID DESORMEAUX; FLOYD W.
MORRISON, JR.; JOHN EBERLING, JR.,
                                        Defendants-Appellees.

************************************************************

K.M. SHIPLEY; ET AL

                                        Plaintiffs

K.M. SHIPLEY; T.E. MOOR, III; GLENN DAVID MOOR; MARIAN CAFFREY
CAMPBELL; BILLY BRYANT, et ux; ANN BRYANT,
                                        Plaintiffs-Appellants,

                              versus

STATE OF TEXAS; GALVESTON COUNTY; GULF COAST ROD, REEL AND GUN
CLUB; TEXAS PARKS & WILDLIFE; GENERAL LAND OFFICE; TEXAS GENERAL
LAND OFFICE,
                                        Defendants-Appellees.

************************************************************

ROY STEINHAGEN; ET AL

                                        Plaintiffs

ROY STEINHAGEN; KIM STEINHAGEN; CHARLES FONTENIER; WANDA FONTENIER,
                                        Plaintiffs-Appellants,

PATRICK A. GREEN; THERESA GREEN; RALPH SAUER; MARGARET JO SAUER,
                                        Intervenor-Plaintiffs-
                                        Appellants

                              versus

GULF COAST ROD, REEL AND GUN CLUB; TEXAS PARKS & WILDLIFE,
                                        Defendants-Appellees.

**********************************************************

JAMES D. HEARN; SANDRA HEARN,
                                        Plaintiffs-Appellants,


                              versus

GULF COAST ROD, REEL AND GUN CLUB; WAYNE STUPKA; DAVID DESORMEAUX;
ROBERT H. KENT, FLOYD W. MORRISON, Jr.; JOHN EBERLING, Jr.,
                                        Defendants-Appellees.

-------------------------

Appeal from the United States District Court
for the Southern District of Texas

-------------------------

August 25, 1998

Before REYNALDO G. GARZA, HIGGINBOTHAM, and EMILIO M. GARZA,
Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This case involves several lawsuits brought by beachfront property owners in Galveston, Texas, against both public and private defendants. The suits allege that the defendants' conduct contributed to the dramatic erosion problems that the plaintiffs are now experiencing on their properties. The plaintiffs state a variety of claims seeking both injunctive and monetary relief. The

2

district court dismissed the lawsuits, concluding that they raised nonjusticiable political questions. We reverse the district court's decision and remand for further proceedings.

I.

In the early 1940s, the Gulf Coast Rod, Reel, and Gun Club obtained about 22 acres of land at Rollover on the Bolivar Peninsula in Galveston County, Texas. In 1954, the Club granted an easement over a portion of this land to the Texas Game and Fish Commission (now the Texas Parks and Wildlife Department) for the purpose of constructing a fish pass.[1] After obtaining a permit from the United States Army Corps of Engineers, the Commission dredged a channel on the land and created the fish pass, now known as the Rollover Fish Pass (or "the Cut"). The Rollover Fish Pass has continuously operated since 1959. In 1988, the Club leased the remainder of its land on the peninsula to the County of Galveston for use as a public park. The lease has been renewed annually, and the property is presently employed as a park.

Unfortunately, in recent years the Texas Gulf Coast has suffered from extensive beach erosion. Loss of beachfront land to

---

[1]A fish pass is a channel cut into land permitting the passage of fish from one body of water to another. This particular fish pass was intended to promote sport fishing in the area by allowing the exchange of water between the Gulf of Mexico and East Bay of the Galveston Bay system.

the sea has been particularly troublesome in the area around the Rollover Fish Pass. According to the plaintiffs, various studies prepared by government agencies over the past 40 years have concluded that the Pass contributes substantially to the erosion problems in its vicinity. Nevertheless, in 1995 the Texas Parks and Wildlife Department made a variety of structural improvements to the Fish Pass. The plaintiffs assert that these improvements dramatically increased the rate of beachfront erosion near the Pass. They claim that a 1995 report by the Army Corps of Engineers concluded that the recent severe erosion west of the Pass was attributable mainly to the 1995 structural improvements made to the Pass.

Government officials have suggested over the years that something be done to alleviate the erosion caused by the Fish Pass, but, as of yet, little action appears to have been taken. Perhaps frustrated with the slow response of the government to the problem, various owners of beachfront property filed several different lawsuits in state court in 1996, raising claims under both Texas law and the U.S. Constitution. The state cases were as follows:

1. The first suit, the Gordon case, was filed in state district court in Galveston County. The Gordon plaintiffs sued the State of Texas, the Club, Galveston County, the GLO, and the Texas Parks and Wildlife Department. Galveston County removed the case to federal district court based on federal question jurisdiction, but the GLO later opposed removal.

2. A similar case, the Shipley suit, was later filed in the same state district court against the same defendants. It was removed and consolidated with the Gordon case.

4

3. The Steinhagen case was filed in state district court in Jefferson County, Texas, seeking damages and a temporary injunction against the Club and Texas Parks. Both defendants removed it to federal district court in Beaumont, and it was later transferred to Galveston and consolidated with the Gordon and Shipley cases.

4. Finally, the Hearn case was filed in state district court in Jefferson County, Texas, seeking relief against the Club and the Club's Board of Directors individually. The Hearn case also was removed and then transferred to Galveston federal district court.

Thus, eventually the federal district court for the Southern District of Texas, Galveston Division, came to possess jurisdiction over all four of the plaintiffs' cases.

The defendants responded to the plaintiffs' lawsuits by filing a variety of motions seeking to dismiss their claims. The State and Texas Parks moved to dismiss based on Eleventh Amendment immunity. The General Land Office, GLO, raised Eleventh Amendment immunity, the political question doctrine, failure to make more definite allegations in the pleadings, and various state law defenses. Galveston County filed a Rule 12(b)(6) motion to dismiss - alternatively for summary judgment, asserting substantive defenses. The Club filed a motion for summary judgment, also raising substantive defenses. The Club Board filed no dispositive motions.

By order dated May 27, 1997, the district court dismissed the plaintiffs' cases. The court reasoned that the relief requested by the plaintiffs would require it to second-guess the decisionmaking of Congress and various federal agencies. Accordingly, the court

held, the cases raised nonjusticiable political questions. The court also noted in passing that the plaintiffs' claims would likely be barred anyway by the Eleventh Amendment, sovereign immunity, statutes of limitations, and other defenses. The court then dismissed all of the plaintiffs' claims with prejudice, presumably because of the political question doctrine. It also granted all of the defendants' dispositive motions, despite its ruling on justiciability. The plaintiffs timely appealed.

## II.

The political question doctrine erects a barrier to justiciability to those matters which are inappropriate for judicial determination. See Texas Assoc. of Concerned Taxpayers, Inc. v. United States, 772 F.2d 163, 165 (5th Cir. 1985), cert. denied, 476 U.S. 1151 (1986). The foundation of the political question doctrine is the constitutional principle of separation of powers among the branches of government. See Occidental, Inc. v. Certain Cargo of Petroleum, 577 F.2d 1196, 1203 (5th Cir. 1978), cert. denied, 442 U.S. 928 (1979). The doctrine prohibits courts from adjudicating those questions whose resolution is committed by the Constitution to a branch of government other than the judiciary. See Elrod v. Burns, 427 U.S. 347, 351 (1976). In Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court laid out the elements said to typically mark a political question:

6

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217.

In deciding that the plaintiffs had asked it to answer "political questions," the district court analyzed separately their demands for injunctive and monetary relief. The court first noted that the request for injunctive relief would require it to wade deeply into policy decisions best left to those government agencies charged with overseeing the Gulf Coast. In a flourish reminiscent of Judge John R. Brown, it also expressed a concern about its ability to manage such relief: "While the Court presides over a District by the sea, it is not endowed with the powers of Poseidon. It cannot control the tides, nor can it, on its own accord, order a major geologic change in the coastline of the state of Texas. The Court does not have the inclination, the capabilities, nor the power to discover, develop, and implement procedures for filling in Rollover Fish Pass."

Turning to the damages sought by the plaintiffs, the court acknowledged that money damages are less prone to political question problems, for typically they are judicially manageable and

7

are not intrusive into the business of the other branches of government. The court noted, however, that in this particular case the plaintiffs' damages claims were "inextricably intertwined with their request for injunctive relief." Because the plaintiffs' claims for injunctive relief were nonjusticiable, reasoned the district court, so too were their claims for damages. Moreover, the district court argued that the plaintiffs' questionable claims for actual damages, calculated based upon the passage of time, highlighted the political nature of their requested relief.[2]

We are not persuaded that the plaintiffs' claims for injunctive relief and damages are barred by the political question doctrine; at least it is not determinable at this early stage in the litigation. It is true that requests for injunctive relief can be particularly susceptible to justiciability problems, for they have the potential to force one branch of government -- the judiciary -- to intrude into the decisionmaking properly the domain of another branch -- the executive. See Koohi v. United States, 976 F.2d 1328, 1332 (9th Cir. 1992) ("[B]ecause the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far

_____

[2]As the district court stated: "Plaintiffs also seek actual damages in the amount of $730 million, which in their estimation, equals one dollar a day for every day of geological time that it took to create Bolivar Peninsula. (Literal Biblical interpretation would, of course, limit damages to $6.00)."

more likely to implicate political questions."), cert. denied, 508 U.S. 960 (1993).  Despite the murky limits of the doctrine and its overlap with other concepts, such as standing, it is fair to say that, Guaranty Clause cases aside, the potential for a clash between a federal court and other branches of the *federal* government is fundamental to the existence of a political question; a simple conflict between a federal court and state agencies does not implicate the doctrine.  See Baker, 369 U.S. at 210 ("[I]t is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'").  Here, the plaintiffs have requested no action be taken by any unit of the federal government.  Rather, their claims are directed solely at the conduct of state agencies or private entities,[3] and not their republican form.

---

[3]The Gordons' request for a preliminary injunction, for example, states:
> Plaintiffs request this Court to issue an immediate emergency injunction to:
> 1.   Close the Rollover Fish Pass . . . .
> 2.   Closure to be of sufficient wall material and height to withstand waves and tides.
> 3.   Closure to contain gates in the wall, so as to open for outgoing tides and high north winds, to prevent flooding on the north side of the fish pass.
> 4.   Both defendants to provide 24 hour a day emergency personnel to monitor the closure and continuing thereafter, subject to further order of this court.
> 5.   Defendants to replace dunes, earth and beach on both sides of the [fish pass] for a distance of approximately 2 miles on the west and 1 mile on the east.
> 6.   Defendants to stabilize the beach areas on both east and west sides of the [fish pass], to prevent further

9

The district court, however, reasoned that the plaintiffs' claims necessarily challenge federal policy. The court noted that the original dredging of the Fish Pass was done pursuant to a permit issued by the Army Corps of Engineers, and in later years the Corps has refused to provide funding to correct the erosion problem in the Rollover area (at the same time that it had approved other dredging projects in the vicinity of the Pass). Thus, concluded the court, it could not order state agencies to correct the erosion problem caused by the Fish Pass without intruding into existing federal policy. Furthermore, the court argued that the erosion problem could not possibly be remedied effectively without the significant intervention of the federal government, both in terms of manpower and financial assistance.

We disagree that the plaintiffs' claims for injunctive relief would require the district court to abrogate any significant federal policies. Although in the 1950s the Army Corps of Engineers issued a permit allowing the dredging of the Cut, the dredging was the State's undertaking, and the Cut was located on land subject to an easement owned by the State. Thus, prior

---

erosion.
7. Defendants to remove all concrete on both sides of the [fish pass] for a distance of two miles.
8. Remove all obstructions on the beach area preventing or interfering with the public's right to pass over the beach.
9. Defendants to test, monitor, sanitize the beaches and beach front tributaries for evidence of bacteria, fecal material, asbestos, and products harmful to plaintiffs and the public.

10

federal involvement in the Cut has been, at best, secondary. Moreover, it is not clear that acting to halt the alleged erosion caused by the Fish Pass would necessarily conflict with the current policy of the federal government. In fact, the Corps has issued several memoranda in recent years concluding that the Fish Pass is causing severe erosion and recommending that some remedial action be taken to fix the problem.

Similarly, we are not convinced that the plaintiffs could not obtain effective injunctive relief without hauling federal agencies before the district court. The plaintiffs' pleadings essentially request the State to fill in the Cut and provide some additional beachfront restoration in its immediate vicinity. The plaintiffs' claims for injunctive relief, as they now stand, would require little federal involvement, apart perhaps from the issuance of a permit by the Army Corps of Engineers. It may be that as this litigation develops it will become apparent that nothing can be done to correct the erosion problem absent massive federal intervention. At that point, nonjusticiability might come clear. On their face, however, the pleadings do not now create a conflict with the federal government, and we refuse to speculate that one will arise in the future.

Similarly, the plaintiffs' claims for monetary relief are justiciable. Indeed, as compared to injunctive relief, requests for monetary damages are less likely to raise political questions. Monetary damages might but typically do not require courts to

11

dictate policy to federal agencies, nor do they constitute a form of relief that is not judicially manageable. See Koohi, 976 F.2d at 1332 ("A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable. . . . [T]he granting of [monetary] relief will not draw the federal courts into conflict with the executive branch.").

The district court, however, held that the plaintiffs' request for monetary relief, like their request for injunctive relief, was barred by the political question doctrine. The court reasoned that the plaintiffs' claims for damages were "inextricably intertwined with their request for injunctive relief," so the justiciability barriers to injunctive relief foreclosed monetary relief as well. Yet even if the federal government were an indispensable party to the case, as the district court argued, that fact would not necessarily bar the plaintiffs' claims for damages. The plaintiffs assert, among other things, takings claims. As the Supreme Court has explicitly acknowledged, citizens can sue the federal government on a takings theory for the flooding and erosion of their land caused by government projects. See United States v. Dickinson, 331 U.S. 745, 750 (1947) ("When [the government] takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away as a result of that flooding."). There is nothing inherent in erosion claims making

12

them difficult to manage judicially; the district court need only determine the existence of liability and, if necessary, the extent of damages. In <u>Applegate v. United States</u>, 35 Fed. Cl. 406 (Fed. Cl. 1996), for example, the United States Court of Federal Claims permitted a takings suit to go forward against the United States brought by beachfront property owners who claimed that a federal harbor project had caused coastal erosion. The <u>Applegate</u> court did not so much as mention the political question doctrine. <u>See also</u> <u>Owen v. United States</u>, 851 F.2d 1404 (Fed. Cir. 1988) (similar takings case).

There are, to be sure, enormous problems with the plaintiffs' enormous monetary claims. For example, the plaintiffs seek $730,000,000 in actual damages, or $1 for every day of geological time it took to create the Bolivar Peninsula. Obviously, $730,000,000 has little connection to the actual property damages that may have been suffered by the plaintiffs, and the district court focused on this fact in concluding that their monetary claims were not judicially manageable. Yet if the plaintiffs have misstated or overinflated their damages, the problem is with their pleadings. The district court could grant leave to amend to state more appropriate damages, or it could dismiss for failure to do so. Regardless, the defect in the plaintiffs' claim for damages is a substantive defect in their case; it has nothing to do with the political question doctrine. <u>Cf.</u> <u>Masayesva on Behalf of Hopi Indian Tribe v. Hale</u>, 118 F.3d 1371, 1378 (9th Cir. 1997)

13

(concluding that difficult calculation of damages in case concerning dispute between two Native American nations did not constitute a political question), cert. denied, 118 S. Ct. 1048 (1998).

We hold that the district court erred when it dismissed the plaintiffs' claims as nonjusticiable political questions. Neither the plaintiffs' requests for injunctive nor monetary relief raise issues that cannot properly be resolved by a federal court.

### III.

In addition to invoking the political question doctrine, various of the defendants also claimed Eleventh Amendment and sovereign immunity, raised the statute of limitations, and sought summary judgment on the merits. In its opinion, the district court discussed at length how the case before it was a nonjusticiable political question, but it also noted in passing that the plaintiffs' claims might also be susceptible to these other defenses. The district court then dismissed the plaintiffs' claims with prejudice, presumably on political-question grounds. In the same breath, however, it granted all of the defendants' other dispositive motions.

The defendants now assert that even if we reverse the district court's dismissal based on justiciability, we may still uphold its dismissals based on immunity, limitations, and the other grounds.

14

We do not interpret the district court's opinion, however, to be a formal disposition of the plaintiffs' cases on these other bases. The court held that the plaintiffs' claims were nonjusticiable under the political question doctrine. Having concluded that it lacked the power to adjudicate the plaintiffs' claims, logically the district court could not then proceed to address the merits of the other defenses raised by the defendants. Indeed, the discussion of those other defenses in the district court's opinion is cursory at best. Thus, although the court's order contained language purporting to grant all of the defendants' dispositive motions, we refuse to give the order that effect.

We will remand to the district court to give it the opportunity to consider in full the defendants' invocation of these various other defenses. On their face, the plaintiffs' claims do appear to suffer from some serious deficiencies. Most notably, their claims for money damages against entities of the State of Texas must confront the Eleventh Amendment.[4] Rather than dispose

_____

[4]Although the plaintiffs opposed dismissal on Eleventh Amendment grounds before the district court, they now support a remand to state court on that basis. The plaintiffs argue that the Eleventh Amendment destroys this court's subject matter jurisdiction, requiring a remand of their entire cases to state court. They argue that we must decide the Eleventh Amendment issue even before we reach any justiciability questions, and they cite in support of their position our decision in McCay v. Boyd Constr. Co., 769 F.2d 1084 (1985). The Supreme Court, however, recently rejected our McCay rule. See Wisconsin Dept. of Corrections v. Schacht, 118 S. Ct. 2047 (1988). Considering the Schacht case, along with the Court's analysis of the nature of Eleventh Amendment immunity in Idaho v. Couer d'Alene Tribe, 117 S. Ct. 2028, 2033 (1997) (distinguishing Eleventh Amendment immunity from defects in

of this case in a piecemeal fashion -- with our court resolving the Eleventh Amendment issues and the district court addressing all other matters -- we think the most efficient course of action is for the district court to consider all of the relevant defenses at once. Cf. Marathon Oil Co. v. A.G. Ruhrgas, 145 F.3d 211, 225 (5th Cir. 1998) (en banc) (noting possible defect in subject matter jurisdiction but remanding to the district court "for its determination in the first instance").

IV.

We REVERSE the district court's dismissal of the plaintiffs' claims on political-question grounds and REMAND for further proceedings.

---

subject matter jurisdiction), we decline to adopt the plaintiffs' position.